## Kenneth D. Duggin, Trustee

### v.

## C. Douglas Adams

Record No. 840906

October 9, 1987

Present: All the Justices

*James R. Tate (Andrew M. Vanderhoff; Tate and Bywater, Ltd.*, on briefs), for appellant.
*Dexter Odin (David E. Feldman; Nelson Blitz; Odin, Feldman & Pittleman, P.C.*, on brief), for appellee.

STEPHENSON, J., delivered the opinion of the Court.

The question presented in this appeal is whether a motion for judgment contains allegations sufficient to state a cause of action for tortious interference with a terminable-at-will sales contract.

Kenneth D. Duggin, Trustee, sued C. Douglas Adams, claiming that Adams tortiously interfered with Duggin's contract rights with Betty B. Williams for the purchase of a tract of land in Fairfax County. Adams demurred to the allegations contained in Duggin's motion for judgment. The trial court sustained the demurrer. After denying Duggin's "Motion for Reconsideration and/or Leave to Amend," the court entered final judgment for Adams. Duggin appeals.*

In deciding the question presented, we will adhere to the rule that "[a] demurrer admits the truth of all material facts that are properly pleaded." *Bowman* v. *State Bank of Keysville*, 229 Va. 534, 536, 331 S.E.2d 797, 798 (1985). The facts admitted are: "(1) facts expressly alleged, (2) facts which are by fair intendment impliedly alleged, and (3) facts which may be fairly and justly inferred from the facts alleged." *Ames* v. *American Nat. Bank*, 163 Va. 1, 37, 176 S.E. 204, 215-16 (1934) (footnote omitted).

Duggin's motion for judgment contains the following allegations: In July 1978, Duggin entered into a contract to purchase approximately four and one-half acres of land from Williams for $950,000. Adams, an attorney-at-law licensed to practice in the Commonwealth, represented Williams throughout the transaction with Duggin.

Performance of the contract was contingent upon the results of certain engineering studies and upon Fairfax County's approval of an application to rezone the land. The contract provided that either party could terminate it in the event the rezoning contingency was not met within 18 months from the date the contract was ratified.

At the expiration of the 18-month period, the land had not been rezoned. Consequently, Duggin and Williams entered into an addendum to the original contract, which extended the contract period an additional 18 months and provided for a decrease in the purchase price if the rezoning was not approved. The addendum also provided that "[i]n the event settlement has not been finalized on or before 15 June 1981 then this [addendum] and subject contract can be cancelled by either party hereto as provided for in subject contract."

---

* A separate appeal arising out of the same contract was adjudicated in *Duggin* v. *Williams*, 233 Va. 25, 353 S.E.2d 721 (1987).

Duggin expended "a great amount of money, time and effort" for engineering tests and on the rezoning application. Consequently, the value of Williams' land "was substantially increased."

On August 8, 1980, Duggin entered into an agreement with Centennial Contractors, Inc. (now Centennial Development Corporation) (Centennial) for the future assignment of the contract. The agreement provided for Duggin to receive an assignment fee of $119,673.60, contingent upon Centennial's obtaining the property from Williams. On July 22, 1981, Duggin assigned the contract to Centennial.

On July 23, 1981, after the lapse of the second 18-month contract expiration period, Centennial delivered by messenger a notice to Adams that Centennial was ready for settlement under the contract, and on the following day Centennial gave notice that settlement had been scheduled for July 29, 1981, at 2:00 p.m. Centennial was present for settlement on the scheduled date and fully prepared to perform under the contract. Williams, however, did not attend the settlement and did not convey title to Centennial. Williams' failure to attend the settlement and convey title "was the direct result of Adams' tortious interference with Duggin's contractual rights and caused Duggin to lose his assignment fee."

As Williams' attorney, Adams learned that Centennial was willing to pay Duggin the assignment fee for Duggin's contractual rights. Commencing in June 1981, Adams used this knowledge to "willfully, wantonly, intentionally, maliciously and wrongfully [lay] plans to deprive [Duggin] of this valuable property right and to thereby enrich himself." The essential elements of Adams' plan were to (1) secure cancellation of the Williams-Duggin contract, (2) induce Williams to contract to sell the land to Adams, and (3) sell the Williams-Adams contract to Centennial.

In carrying out his plan, Adams wrote a letter to Duggin, dated June 30, 1981, wrongfully accusing Duggin of breaching the contract and stating that Duggin had forfeited his deposit. Because Adams knew that the contract had not been breached, his letter "was a malicious, knowing, intentional and wrongful act . . . to fraudulently mislead and intimidate [Duggin] into giving up his contract rights."

On the same day that Centennial notified Adams that it was ready to settle with Williams, "Adams willfully, wantonly, wrong-

fully and maliciously induced . . . Williams to sign a contract, which Adams had prepared, giving Adams the right to purchase the subject property and requiring Williams to cancel her contract with Duggin." Williams then sent Duggin a letter, prepared by Adams, "purporting to cancel" the contract. Duggin maintained, however, that the contract was not cancelled because Williams had not returned the deposit.

On July 28, 1981, the day before the scheduled settlement with Centennial, Adams provided Williams with $50,000 and instructed her to use the money to repay Duggin's deposit. At the same time, Adams advised Williams not to attend the settlement scheduled for the following day. In August 1981, Adams contacted Centennial and offered to sell it the Williams property.

Throughout the entire Williams-Duggin transaction, Adams represented that he was acting only as Williams' attorney. In doing so, Adams "willfully, wantonly, and maliciously concealed his true role and the fact that he had begun to act in his own behalf." While Duggin had the right to expect Adams to adhere to the canons and ethics of the Virginia State Bar, Adams, to the contrary, engaged in "deceptive, willful, wanton, malicious and secret self dealing" for his own personal gain. "Adams' willful, wanton, wrongful, knowing, intentional and malicious conduct . . . was aggravated, unjustified and in utter disregard of [Duggin's] contract rights and property interests."

Duggin provided Williams with confidential information concerning the development of the property and his assignment agreement with Centennial. "Adams had access to this confidential information which [Duggin] would not have disclosed to Adams had he known [that] Adams would attempt to use [the] information for his own personal gain and to [Duggin's] pecuniary loss . . . . Adams used his position as . . . Williams' attorney and his resulting access to confidential information, without disclosing his true interest in the matter, to enhance his own competitive position regarding the subject real estate transaction."

We now consider whether these allegations were sufficient to survive a demurrer. A party to a contract has property rights in the performance of and anticipated profits from the contract, and these rights are entitled to protection in the courts. *Worrie* v. *Boze*, 198 Va. 533, 536, 95 S.E.2d 192, 196 (1956). Thus, one who intentionally interferes with another's contractual rights is

subject to tort liability. *Chaves* v. *Johnson*, 230 Va. 112, 120, 335 S.E.2d 97, 102 (1985).

The requisite elements for a prima facie showing of a tortious interference with a contract that is *not* terminable at will are: "(1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted." *Chaves*, 230 Va. at 120, 335 S.E.2d at 102. Once a plaintiff shows that an intentional interference with a contract not terminable at will caused him damage, the burden to show that the interference was justified, privileged, or not improper shifts to the defendant. *Id.* at 121, 335 S.E.2d at 103.

Unlike a party to a contract for a definite term, however, an individual's interest in a contract terminable at will is essentially only an expectancy of future economic gain, and he has no legal assurance that he will realize the expected gain. *See* Restatement (Second) of Torts § 766 comment g (1979). Thus, the cause of action for interference with contractual rights provides no protection from the mere intentional interference with a contract terminable at will. *Hechler Chevrolet* v. *General Motors Corp.*, 230 Va. 396, 402, 337 S.E.2d 744, 748 (1985). *Accord Chaves*, 230 Va. at 121, 335 S.E.2d at 103 (distinguishing interferences with contracts terminable at will and prospective business relationships from interferences with existing contracts not terminable at will). In short, the extent of permissible third-party interference increases as the degree of enforceability of a business relationship decreases.

Nevertheless, the fact that a contract is terminable at the will of the parties does not make it terminable at the will of others. *See Truax* v. *Raich*, 239 U.S. 33, 38 (1915) (recognizing that the weight of authority considers a third party's unjustified interference with an employment-at-will contract actionable). However, the prima facie approach of basing liability on a mere showing that a third party's intentional interference with a contract terminable at will caused damage requires too little of the plaintiff.

Consequently, when a contract is *terminable at will*, a plaintiff, in order to present a prima facie case of tortious interfer-

ence, must allege and prove not only an *intentional* interference that caused the termination of the at-will contract, but also that the defendant employed *"improper* methods." *Hechler Chevrolet,* 230 Va. at 402, 337 S.E.2d at 748 (emphasis added); Restatement (Second) of Torts § 766 comment g (1979) (Until a party terminates an at-will contract, it is "valid and subsisting, and [a third party] may not *improperly* interfere with it." (emphasis added)). *Accord Glass* v. *Glass,* 228 Va. 39, 51-52, 321 S.E.2d 69, 76-77 (1984) (recognizing intentional misconduct on part of interferer as element of cause of action for interference with prospective business or economic advantages and for interference with contracts terminable at will); *Allen Realty Corp.* v. *Holbert,* 227 Va. 441, 449, 318 S.E.2d 592, 597 (1984) (cause of action for interference with prospective contract arises when interference both intentional and improper); *Brotherhood of R. T.* v. *Vickers,* 121 Va. 311, 312-13, 93 S.E. 577, 577 (1917) (allegations that third party wrongfully and unjustifiably interfered with contractual relation between plaintiff and his employer states cause of action).

■ Methods of interference considered improper are those means that are illegal or independently tortious, such as violations of statutes, regulations, or recognized common-law rules. *Leigh Furniture and Carpet Co.* v. *Isom,* 657 P.2d 293, 308 (Utah 1982). Improper methods may include violence, threats or intimidation, bribery, unfounded litigation, fraud, misrepresentation or deceit, defamation, duress, undue influence, misuse of inside or confidential information, or breach of a fiduciary relationship. *Top Service Body Shop* v. *Allstate Ins. Co.,* 283 Or. 201, 210 n.11, 582 P.2d 1365, 1371 n.11 (1978) (plaintiff claiming intentional interference with contractual or other economic relations need not allege and prove all elements of liability for independent tort); *Island Air, Inc.* v. *LaBar,* 18 Wash. App. 129, 143-44, 566 P.2d 972, 980 (1977) (competitor's acquisition and use of confidential contractual information in violation of oral covenant not to compete constituted improper method of interfering with plaintiff's at-will contract). *Compare Glass,* 228 Va. at 52-54, 321 S.E.2d at 77-78 (decision of corporate directors and officers to sell majority stock to prospective purchaser was not prima facie case of tortious interference with minority stockholders' business expectancy with another prospective purchaser) *with Allen Realty Corp.,* 227 Va. at 449, 318 S.E.2d at 597 (allegation that accountant hired to assist in plaintiff realty company's liquidation prevented plaintiff

from entering into contract with prospective purchaser by intentionally failing to disclose purchaser's offer states prima facie cause of action for interference with prospective contract).

Methods also may be improper because they violate an established standard of a trade or profession, *Top Service Body Shop*, 283 Or. at 210, 582 P.2d at 1371, or involve unethical conduct, *Trepel* v. *Pontiac Osteopathic Hosp.*, 135 Mich. App. 361, 377, 384, 354 N.W.2d 341, 348, 350-51 (1984). Sharp dealing, overreaching, or unfair competition may also constitute improper methods. *Kinco, Inc.* v. *Schueck Steel, Inc.*, 283 Ark. 72, 78, 671 S.W.2d 178, 181-82 (1984) (trial court correctly refused to direct verdict for defendant where substantial evidence showed that defendant competitor employed sharp and overreaching actions to interfere with plaintiff's business expectancy); *Light* v. *Transport Insurance Company*, 469 S.W.2d 433, 439 (Tex. Civ. App. 1971) (recognizing that sharp dealing, overreaching, or other competitive conduct "below the behavior of fair men similarly situated" constitutes improper methods of interfering with existing business relationship). *Cf. Hechler Chevrolet*, 230 Va. at 402-03, 337 S.E.2d at 748 (not prima facie improper for competitors to inform customers truthfully that plaintiff car dealer would no longer market competing product or for competitors to entice plaintiff's employees to leave employment, absent allegations of wrongful means).

In the present case, we must examine Duggin's motion for judgment to ascertain whether it alleges a prima facie case that Adams is guilty of tortious interference with the Duggin-Williams contract. Because the contract involved is terminable-at-will, we must determine whether the motion for judgment contains factual allegations that Adams intentionally interfered with Duggin's contractual rights and, in so doing, employed improper methods.

The motion for judgment alleges that Adams, in his role as Williams' attorney, learned that Duggin had expended considerable money, time, and effort on engineering and rezoning, thereby increasing the value of Williams' land. Adams also learned of Duggin's agreement with Centennial and the assignment fee Duggin expected to receive. Duggin alleges that this information was confidential and that he would not have disclosed it to Adams had Duggin known that "Adams would attempt to use that information for his own personal gain."

After learning these things, Adams first wrongfully accused Duggin of breaching the contract, asserting that Duggin, therefore, had forfeited his deposit. Duggin alleges that because Adams knew Duggin had not breached the contract, Adams' actions were "malicious, knowing, intentional and wrongful" and were undertaken by Adams "to fraudulently mislead and intimidate [Duggin] into giving up his contract rights."

Adams also learned that Centennial was prepared to close on the purchase of Williams' land. As soon as he learned of this, Adams "willfully, wantonly, wrongfully and maliciously induced . . . Williams to sign a contract, which Adams had prepared, giving Adams the right to purchase the . . . property and requiring Williams to cancel her contract with Duggin." Adams also furnished Williams with $50,000, instructed her to use the money to refund Duggin's deposit, and advised her not to attend the settlement scheduled with Centennial. Duggin alleges that but for Adams' "willful, wanton, knowing, intentional and malicious interference . . . Williams would have gone to settlement . . . and [Duggin] would have received his assignment fee." Shortly after the scheduled date for settlement with Centennial, Adams allegedly contacted Centennial and offered to sell it the subject property. We believe these allegations, considered as a whole, state a prima facie case of intentional and improper interference with Duggin's contractual rights.

Adams contends, nonetheless, that he "acted within his rights, with just cause, in entering into the contractual relationship with . . . Williams for the purchase of the property." Justification or privilege is an affirmative defense for which the burden of proof rests upon a defendant. *Chaves*, 230 Va. at 121, 335 S.E.2d at 103. The defense is based upon "the relationships between the parties and the balance to be struck between the social desirability of protecting the business relationship, on one hand, and the interferor's freedom of action on the other." *Id*. Specific grounds for the defense include "legitimate business competition, financial interest, responsibility for the welfare of another, directing business policy, and the giving of requested advice." *Id*. Because the sole question in this appeal is whether the motion for judgment alleges a prima facie case of tortious interference with a contract, we express no opinion respecting Adams' affirmative defense.

We hold, therefore, that the trial court erred in sustaining Adams' demurrer. Accordingly, we will reverse the judgment and remand the case for further proceedings.

WHITING, J., dissenting.

The majority recognizes that Adams, as the attorney for the seller in this terminable-at-will contract, might have been justified in advising his client to terminate the contract if "he was responsible for her welfare." Because that justification is an affirmative defense, the majority concludes that the case cannot be disposed of upon a demurrer.

However, the motion for judgment incorporates by reference not only the contracts between the original seller (Williams) and the original buyer (Duggin), but also Duggin's subsequent contracts with Centennial Contractors (Centennial), as well as Adams' contract with his client, Williams. Therefore, we must consider these exhibits as a part of the plaintiff's pleadings. *Hagan Estates, Inc.* v. *New York Mining & Mfg. Co.*, 184 Va. 1064, 1071, 37 S.E.2d 75, 78 (1946). I believe these exhibits establish Adams' justification or privilege as a matter of law.

The Williams-Duggin and Williams-Adams contracts differ in the following significant respects:

(1) The original Duggin purchase price of $950,000 for 4.578 acres, or 199,456.88 square feet at $4.76 per square foot, was conditioned on future rezoning of the land for shopping center development. Because the zoning contingency in the first contract, dated March 7, 1978, could not be met, the parties reduced the zoning requirement and, therefore, the purchase price to $4.00 per square foot, or $797,827.52. These reductions were reflected in an addendum dated March 19, 1979, and confirmed in the contracts Duggin made with Centennial on August 8, 1980 and July 22, 1981. Moreover, Duggin's counsel stated in oral argument that at the time of the proposed closing, the land was zoned for office building development. For that reason, Duggin, who was a shopping center developer, assigned his contract with Williams to Centennial, an office building developer. This assignment resulted in a profit to Duggin of $119,673.60.

(2) On July 23, 1981, after Williams had exercised her contractual right to terminate the Adams' contract, she contracted to sell Adams the property, which was then zoned for office building development, for $850,000. At oral argument, Duggin's counsel said that after Williams terminated her contract with Duggin, Adams went to Centennial and offered to sell Centennial the property at an increase of $119,673.60 over the amount Duggin had agreed to pay Williams. Duggin's counsel also stated Adams and Williams were going to split that amount. The increase of $52,172.48 between Williams' purchase price to Adams and her purchase price to Duggin was approximately half of the entire additional amount earned by cancelling Duggin's contract. Adams was to pay 12% interest quarterly on his unpaid balance of the purchase price he would have owed Williams, but Duggin would only have paid an effective interest rate of 10-½% on his unpaid balance of the purchase price he would have owed Williams. Adams' counsel said in oral argument, without contradiction by Duggin's counsel, that the differential in interest comprised the balance of one-half of the sum of $119,673.60 (or $59,836.80), earned by Williams cancelling the Duggin contract.

Thus, it was obviously to Williams' advantage to terminate her at-will contract with Duggin. Because the documents incorporated by reference are a part of the pleadings, I believe the issue of Adams' justification *is* now before us whether Adams could advise his client to take an action obviously for her benefit without liability to Duggin.

Even though Adams' advice was to his personal benefit and in competition with Duggin, the pleadings show that Adams was also acting as Williams' attorney in advising her to terminate the contract. Whether Duggin could have maintained an action for tortious interference with his contract had the termination been to Williams' disadvantage[1] or profited only Adams is not at issue.

As the majority notes, we have allowed a recovery for tortious interference with contracts at will, provided the intentional interference is accomplished by "improper methods." *See Hechler Chevrolet* v. *General Motors Corp.*, 230 Va. 396, 402, 337 S.E.2d

---

[1] In oral argument, Duggin's counsel asserted that Adams could have cancelled his contract with Williams if proposed engineering and economic surveys were unsatisfactory to Adams. However, that right was never exercised and expired by its own terms 60 days after the parties executed the contract.

744, 748 (1985). Duggin alleges Adams employed the following "improper methods":

(1) Adams acquired *confidential* information and used it for his own benefit. The premise is faulty. Information released to an opposing party to a contract is not confidential in the absence of an agreement to treat it in confidence. Neither counsel cite any cases on this subject, and I have found none. However, we see the principle of confidentiality in operation in attorney-client and husband-wife privileged communication cases. One of the basic requirements of the privilege in each instance is that the information not be communicated by the holder of the privilege to the confidant in the known presence of a third party who is outside that confidential relationship. *See United States* v. *United States Shoe Corp.*, 89 F. Supp. 357-58 (D. Mass. 1950); *C. Friend, The Law of Evidence in Virginia*, § 64 (2d ed. 1983). Williams and Adams, as parties on the opposite side of Duggin in these competitive matters, were not in a confidential relation with Duggin. Therefore, in the absence of Williams' express agreement to limit the use of Duggin's information, any communication from Duggin could be used in any way Williams and Adams deemed beneficial.[2]

The *express agreement* to treat the information released as confidential in *Island Air, Inc.* v. *LaBar*, 18 Wash. App. 129, 566 P.2d 972 (1977), distinguishes that majority-cited case from this case. No such agreement appears in the pleadings in this case.

(2) Adams breached a fiduciary relationship. We have decided a case involving tortious interference with a contract in connection with the breach of a fiduciary duty. *Allen Realty Corp.* v. *Holbert*, 227 Va. 441, 449, 318 S.E.2d 592, 597 (1984). However, we found the *Allen Realty* defendant breached a fiduciary duty he owed his client; Adams' *sole* fiduciary duty was to his client, Williams. Code of Professional Responsibility Part 6 § II, Canon 7, EC 7-9, EC 5-21 (1983).[3] Adams had *no* fiduciary duty to Dug-

---

[2] This statement is not to imply any approval of Adams' conduct vis-a-vis Williams. He may well have had serious ethical problems if Williams had found that she could have dealt directly with Centennial without "splitting the profit with Adams."

[3] Canon 7 is entitled: "A lawyer should represent his client zealously within the bounds of the law." EC 7-9 provides in pertinent part: "In the exercise of his professional judgment on those decisions which are for his determination in the handling of a legal matter, a lawyer should always act in a manner consistent with the best interests of his client." EC 5-21 provides in pertinent part: "The obligation of a lawyer to exercise professional judg-

gin, the opposing party to the contract. In *Glass* v. *Glass*, 228 Va. 39, 53, 321 S.E.2d 69, 77-78 (1984), we recognized this distinction in pointing out that while an executor might have had to answer to the estate for failing to encourage competitive bidding for shares of corporate stock held by the estate because of his alleged misrepresentations which avoided such bidding, such misrepresentations were "irrelevant" in a claim against the executor by other stockholders whose contractual expectations were damaged by the executor's contract.

At least one court has considered a case with facts similar to those in this case. *See Livoti* v. *Elston*, 52 A.D.2d 444, 384 N.Y.S.2d 484 (1976). In *Livoti*, an attorney for the seller of real estate offered his client more money for the real estate than the purchaser had contracted to pay in an oral contract of sale. The court held that while there could be a tortious interference with a voidable contract, the attorney had not improperly interfered with the contract because he was not guilty of either fraud or misrepresentation in inducing the seller to sell the property to him. As the court said, the attorney "owed no duty to the [buyers] to refrain from offering [his client, the seller] a higher price than they had agreed to pay, although the ethical propriety of his conduct is open to question in view of his role in the negotiations." *Id.* at 447, 384 N.Y.S.2d at 486.

(3) Duggin refers to Adams' letter to him in which Adams claimed Duggin had forfeited his deposit because Duggin had not closed within the required period as an instance of Adams' wrongful attempts to "fraudulently mislead and intimidate [Duggin] into giving up his contractual rights." There are two flaws in this as a ground for relief. First, the pleadings show that the letter did not cause Duggin to give up his contractual rights and it is, therefore, irrelevant. Second, the forfeiture would only have benefited Adams' client and not Adams. If we held that an attorney's attempt to secure a benefit solely for his client was an "improper method" of interfering with a contract, this would stretch the majority-created duties an attorney now owes his client and the opposing party beyond the bounds of reason.[4]

---

ment solely on behalf of his client requires that he disregard the desires of others that might impair his free judgment."

[4] I fear this may be a necessary consequence of the majority holding; the next case we hear may be one in which the attorney did everything Adams did, but simply had his client reap the entire reward.

Because Duggin alleges no "improper methods" of interference, I believe the demurrer should be sustained on either of two reasons:

(1) Duggin had the burden to allege "improper methods" in his motion for judgment. The motion for judgment contains conclusory allegations of "improper methods," "malicious, knowing, intentional, wrongful, willful, wanton [interference]." However, the "material facts . . . properly pleaded," *Bowman* v. *State Bank of Keysville*, 229 Va. 534, 536, 331 S.E.2d 797, 798 (1985), in the motion for judgment, and exhibits attached, set forth the particulars of the "improper methods," and they demonstrate privilege or justification as a matter of law.

(2) Where the allegations in a motion for judgment show contributory negligence as a matter of law, we have sustained a demurrer even though contributory negligence is an affirmative defense. *Baker* v. *Butterworth*, 119 Va. 402, 407, 89 S.E. 849, 849-50 (1916). While I recognize that Adams has the burden of establishing the affirmative defense of justification or privilege, *Chaves* v. *Johnson*, 230 Va. 112, 121, 335 S.E.2d 97, 103 (1985), I believe that defense conclusively appears from Duggin's pleadings and exhibits. *Cf. Freed* v. *Manchester Service, Inc.*, 165 Cal. App. 2d 186, 190-91, 331 P.2d 689, 691-93 (1958).

Duggin's claim for a loss of profit because of Adams' conduct presents a case of superficial merit. However, an analysis of the claim reveals its flaws. More importantly, the majority decision places yet another strain on our traditional attorney-client relationship. *See* Saltzburg, *Lawyers, Clients and the Adversary System*, 37 Mercer L. Rev. 647 (1986). I would sustain the demurrer, for the reasons I have assigned.