## CIRCUIT COURT OF FAIRFAX COUNTY

Alan J. Zuccari, Inc.,
t/a Hamilton Ins. Agency

v.

Ronald E. Adams
and Quantum Risk Management, Inc.

April 10, 1997

Case No. (Chancery) 143224

BY JUDGE M. LANGHORNE KEITH

This case was originally filed by Plaintiff on February 27, 1996. The Court took this matter under advisement on January 27, 1997, and has now had an opportunity to review the memoranda and the evidence presented at trial. In Plaintiff's Amended Bill of Complaint, filed on May 10, 1996, Plaintiff alleged that the Defendant(s) are liable for breach of contract, breaches of duty of loyalty and fiduciary duties, tortious interference with contract, wrongful misappropriation of trade secrets, and conversion. For the reasons stated below, the Court finds the Defendant, Mr. Adams, liable to Plaintiff on all of the counts in the Amended Bill except the tortious interference with business expectancy claim and the conversion claim. The Court finds for the Defendant, Quantum Risk Management, Inc., on Counts IV and V of the Amended Bill of Complaint.

## 1. *Background*

Plaintiff Alan J. Zuccari, the President of Hamilton Insurance Agency, a Virginia corporation that provides insurance and risk management services throughout the United States, hired Adams as its Senior Vice President. On June 13, 1992, Adams signed an at-will contract which contained a restrictive covenant forbidding Adams from doing business with or disclosing information about Hamilton's clients for five years after his job terminated.

While representing Hamilton in his capacity as Senior Vice President, Adams learned about the industry and developed professional relationships with Hamilton's clients. One client Adams worked with was Community Care of America, Inc. ("CCA"). In fact, Hamilton hired CCA's risk manager, Diane Colby, pursuant to CCA's request. Adams also developed a close working relationship with CCA's chief operating officer, William Fillipone. Mr. Fillipone then left CCA and eventually became President of a business called Horizon Facilities Management, Inc. Defendant told Zuccari about Mr. Fillipone's new position, and Zuccari instructed him to pursue business with Horizon.

According to Plaintiff, Defendant then pursued business opportunities with Mr. Fillipone and Horizon on his own behalf. Although Adams was still the Vice President of Hamilton, he agreed to provide risk management services to Horizon through his own newly-created company, Quantum. He also entered into a partnership agreement with Ms. Colby, although she was still with Hamilton, under which she agreed to leave Hamilton for a partnership interest in Quantum.

Before starting his company, Adams told Zuccari about the Horizon deal and tried to persuade him to give Adams a consulting contract in exchange for Horizon's business. Plaintiff refused, stating that Adams had violated his duties to Hamilton. Adams' last day at work with Hamilton was February 9, 1996.

## 2. *Restrictive Covenant*

Adams' Employment Contract ("Contract") required him to: (i) promptly report all business to the company; (ii) not contact or divulge information about Hamilton's customers for five years after termination; and (iii) to return any of the company's property when his employment with the company terminated. The gist of Plaintiff's argument is that Adams breached Paragraphs 4 and 5 of the Contract by failing to disclose the Horizon deal to Hamilton and diverting Horizon's business to his own company, Quantum. Plaintiff also

claims that Adams breached Paragraphs 5C and 6 of the Contract by not returning his day planner, Rolodex, and the Schedule of National Accounts when his employment at Hamilton terminated.

Under Virginia law, a valid covenant not to compete must be "reasonably necessary for the protection of the employer and [must] not impose undue hardship on the employee." *See Richardson v. Paxton Co.*, 203 Va. 790 (1962). The restraint must also be reasonable from the standpoint of sound public policy. *Meissel v. Finley*, 198 Va. 577 (1956). The covenant must be supported by valuable consideration. In an at-will employment situation, such as the one here, if the employer continues the employee's employment after the employee signs the contract containing the covenant not to compete, the continuing employment relationship supplies the consideration for the covenant not to compete. *Paramount Termite Control Co. v. Rector*, 238 Va. 171 (1989). In equity, the determination of whether a covenant not to compete is valid is fact specific. *Richardson v. Paxton Co.*, 203 Va. 790 (1962). The employer has the burden of proving that the covenant is reasonable. *Id.* Moreover, noncompetition clauses must be strictly construed against the employer. *Grant v. Carotek, Inc.*, 737 F.2d 410 (4th Cir. 1984).

The Court finds that the Plaintiff has met its burden. Paragraph 5 of the Contract meets the criteria used by Virginia courts to determine the validity of noncompetition agreements and is thus valid and enforceable. *Paramount Termite v. Rector, supra.* The restrictive covenant is reasonable from the standpoint of the employer, Hamilton, as its provisions protect the legitimate business of the company. It is also reasonable from the Defendant employee's standpoint, as he is not precluded from earning his livelihood under its provisions. For example, Defendant Adams could have gotten a job next door in the same line of work, and he would not have violated the clause as long as he did not solicit any of Hamilton's customers or divulge any information concerning them. The restraint is also reasonable from a public policy perspective, as Hamilton should be able to protect its client base from former employees who may leave its employ but continue in the same line of business.

The Court is unconvinced by Defendants' argument that the provision's lack of geographic restriction constitutes a world-wide covenant. Virginia law states that the covenant must be reasonable in time and geographic limitation; it does not dictate that there must be a geographic limitation or else the clause is invalid. In the case of *Foti v. Cook*, 220 Va. 800 (1980), cited by the Plaintiff, the Supreme Court dealt with a restrictive covenant that did not specify a geographic location, and it did not construe the lack thereof as constituting a world-wide restriction. Conversely, the Court in the *Roto-Die Co. v. Lesser* case, 899 F. Supp. 1515 (W.D. Va. 1995), cited by the

Defendants, did strike down a covenant not to compete because the Court construed the clause to be world-wide where there was no mention of a geographic limitation. However, the clauses in that case were very different from Paragraph 5 of the Employment Contract between these parties. In *Roto-Die*, the clauses prohibited the employee from engaging in any competitive business in the same line of work. Paragraph 5 only forbids contact or divulging information about its clients. Also, the company in *Roto-Die* admitted that the clause was to have world-wide application. Here, Hamilton has explained that no geographic limit was imposed because it did not mind if its employees competed with it in any geographic location, so long as they did not take its clients within five years.

The Court also finds that the five-year period limitation in Paragraph 5 is reasonable, especially in light of the *Meissel* case, *supra*. In *Meissel*, the Court held that a five-year, fifty-mile restrictive covenant was reasonable, particularly since the restriction "was directly related to an important element of the insurance business; i.e. policy renewals." *Id.* at 583. Apparently, Adams had no experience in the industry before working for Hamilton and developed all his contacts through his employment with Hamilton. The five-year restriction serves to protect Hamilton from employees such as Adams, who might leave and try to compete with their former employer after gaining experience and contacts from the company.

The Court disagrees with the Defendants' argument that the contract is invalid because it was an at-will contract, unsupported by consideration. According to *Paramount Termite, supra* at 176, continued employment after an employee has signed a contract is adequate consideration to support the validity of the contract. The *Paramount* Court also found the defendants' breach of employment agreement argument invalid, as the employees "point[ed] to no contractual obligation upon Paramount to continue any of them in their particular positions, or, for that matter, to any obligation on Paramount's part to maintain fixed salaries." The situation now before the Court is the same. Defendants argue that Hamilton breached its employment agreement by not paying adequate compensation, but they point to no clause in the employment agreement concerning compensation.

Although the Court finds that the contract entered into between the parties is valid and enforceable, the evidence shows that Horizon was not a "customer" of Hamilton, and thus the Contract was not breached by Adams when he solicited and diverted Horizon's business. However, the Court holds that Defendant's appropriation of Plaintiff's Schedule of National Accounts does violate Paragraphs 5C and 6 of the Employment Contract, and therefore,

Plaintiff is entitled to its attorneys' fees. *See* Court's discussion of damages, *infra.*

### 3. *Breach of Fiduciary Duty and Breach of Loyalty Claims*

The Court finds that Adams breached his fiduciary duties and the duty of loyalty he owed to Hamilton and that the Plaintiff suffered damages as a result of his breach. *See* Court's discussion of damages, *infra.* "It is well settled that where one person sustains a fiduciary relation to another, he cannot acquire an interest in the subject matter of the relationship adverse to such other party. If he does so, equity will ... compel him to convey to his associate a proper interest in the property or to account to him for the profits derived therefrom." *Greenspan v. Osheroff*, 232 Va. 388, 400-401 (1986) (quoting *Horn v. Holley*, 167 Va. 234, 240 (1936)).

Adams, while employed in his capacity as vice-president, usurped a business opportunity that otherwise could have gone to his employer Hamilton. Although Horizon had never been an active client of Hamilton's, its President, Mr. Fillipone, had been. Adams did not know Mr. Fillipone before he began working for Hamilton, and it was while he was Vice President that he was able to cultivate a business relationship with Mr. Fillipone. When Adams told Zuccari that Mr. Fillipone had become Horizon's President, Zuccari told him to pursue the new company's account. Adams then bargained for his own self interest and conspired to create his own risk management and insurance company, Quantum, which subsequently contracted to provide risk management to Horizon. Adams, who was an agent of Hamilton, was "bound to exercise the utmost good faith and loyalty toward his principal or employer ... [he was] duty bound not to act adversely to the interest of his employer by serving or acquiring any private interest of his own in antagonism or opposition thereto .... This is a rule of common sense and honesty as well as of law." *Horne v. Holley*, 167 Va. 234, 241 (1936), *citing* 2 Am. Jur., *Agency*, § 252, p. 203, and *Ferguson v. Gooch*, 94 Va. 1, 8 (1896).

### 4. *Tortious Interference Claim*

Hamilton claims that (i) Adams tortiously interfered with the contractual relationship between Hamilton and Ms. Colby by entering into a partnership with Ms. Colby to form Quantum; and (ii) Adams and Quantum tortiously interfered with Hamilton's prospective business relations with Horizon.

Under Virginia law, the elements of a tortious interference claim with an at-will contract are: (1) a valid contractual relationship, (2) knowledge of the relationship by the interferer, (3) intentional interference causing breach, (4) resultant damage to the party whose relationship has been disturbed, and (5) interference by improper means. *Duggin v. Adams*, 234 Va. 221, 226 (1987). Using confidential information for personal gain and diverting business from an employer has been held to constitute improper means. *Id.* The *Duggin* Court explained that "[i]mproper methods may include violence, threats or intimidations, bribery, unfounded litigation, fraud, misrepresentation or deceit, defamation, duress, undue influence, misuse of inside or confidential information, or breach of a fiduciary relationship." *Id.* at 227.

Regarding the tortious interference with contract claim, the Court finds that the Defendant's actions constitute tortious interference as set forth in *Duggin*. The evidence at trial illustrated that Adams tortiously interfered with the contract between Ms. Colby and Hamilton. However, any damages resulting from that breach must flow from a loss of business between CCA and Hamilton. As the Court could find no such evidence of damages, Plaintiff is not entitled to damages on this Count.

Because the Horizon relationship had not blossomed into a contractual relationship, the Plaintiff's tortious interference claim based on a business expectancy must fail, against both Adams and Quantum.

## 5. *Misappropriation of Trade Secrets and Conversion*

Plaintiff also requests equitable relief and attorney's fees for violation of the Virginia Uniform Trade Secrets Act, Va. Code § 59.1-336, *et seq*. Hamilton contends that Adams possessed a trade secret when he learned that Fillipone wanted to out source Horizon's risk management work. Adams came upon this information due to his position as Vice President of Hamilton. Plaintiff claims that Adams misappropriated the trade secret by acting upon the information only for his own benefit. Furthermore, Hamilton argues that a document called a Schedule of National Accounts (which is in Defendant's possession), containing client policy information such as expiration dates and fees and commissions, constitutes a trade secret.

The Court finds that Adams' knowledge of the Horizon deal cannot be construed as a trade secret misappropriated by Adams because it does not meet the definition laid out under § 59.1-336(4). In contrast, the Schedule of National Accounts does meet the definition; it is economically valuable property of Hamilton, and Hamilton has expended efforts to maintain its secrecy. Consequently, the Court will grant the injunction Hamilton requests

and will require Defendant to return the Schedule of National Accounts. Adams and his associates are also prohibited from conducting business with any of the clients listed in the document for a period of five years in accordance with Paragraph 5 of the Employment Agreement. However, although the Court finds that the Defendant did take and is responsible for Hamilton's Schedule of National Accounts, Plaintiff is not entitled to damages on the misappropriation claim as the Court could find no evidence that the Defendant ever used the Schedule. The Court also declines to award attorneys' fees on this count, as the Court finds that the misappropriation was not willful and malicious.

## 6. *Conversion*

As the Court found that Adams did not use the trade secret he misappropriated, the Court also holds that no conversion occurred. *Unlimited Screw Products, Inc. v. Malm*, 781 F. Supp. 1121 (E.D. Va. 1991). Plaintiff has not demonstrated any instance where the Defendant converted Plaintiff's property for his own use. Furthermore, "potential future contracts do not constitute 'property' necessary to support a conversion claim." *Id.* at 1131.

## 7. *Damages*

The Court finds that Adams did divert a business opportunity that should have belonged to the Plaintiff and that Adams is indebted to Plaintiff for its lost profits. After reviewing the evidence, and in particular Plaintiff's Exhibits 27, 39 and Defendant's Exhibit 11, the Court awards Plaintiff lost profits in the amount of $24,000.00.

Plaintiff argued that it should receive lost profits for the entire two-year contract proposed, but the evidence does not support such an award. Exhibit 39 failed to account in any way for the salary Hamilton would have had to pay Adams or for certain expenses, such as computer software. When these matters are taken into account, the evidence indicates that Plaintiff's lost profits amount to $24,000.00.

Pursuant to the Court's ruling in Plaintiff's favor on Plaintiff's breach of restrictive covenant claim, the Court grants Plaintiff attorney's fees pursuant to Paragraph 7 of the Employment Agreement in the amount of $50,000.00.