**SHENANDOAH ASSOCIATES LIMITED, et al.,**
Plaintiffs,

v.

**Bardyl R. TIRANA, Defendant.**

No. CIV.00–3083(RJL).

United States District Court,
District of Columbia.

March 30, 2004.

Alan I. Baron, Holland & Knight LLP, Washington, DC, Kevin B. Bedell, Dorsey & Whitney, L.L.P., Washington, DC, for Shenandoah Associates Limited Partnership, Jefferson House Associates Limited Partnership, Leesburg Manor Associates Limited Partnership, Plaintiffs.

Alvin Ira Frederick, Eccleston and Wolf, P.C., Baltimore, MD, David D. Hudgins, Hudgins Law Firm, Washington, DC, Richard Wayne Driscoll, Driscoll & Seltzer, PLLC, Alexandria, VA, Sean Charles Edward McDonough, Hudgins Law Firm, P.C., Alexandria, VA, for Bardyl R. Tirana, Defendant.

## ORDER

LEON, District Judge.

This case comes before the court upon cross-motions for summary judgement by the plaintiffs, three limited partnerships registered in Virginia ("the partnerships"), and the defendant, Bardyl Tirana ("Tirana"), an attorney based in Washington, D.C. The partnerships argue in their Motion for Summary Judgment that the undisputed facts establish that Tirana tortiously interfered with their rights under a contract with his client. In his Motion for Summary Judgment, Tirana claims that, *inter alia*, a claim of tortious interference cannot lie because he was acting as an agent for his client and that plaintiffs have failed to produce any evidence raising a genuine issue as to whether he was acting outside the scope of his agency such that he could be held liable. For the reasons stated below, the Court GRANTS Tirana's motion and enters judgment for the defendant.

## BACKGROUND

This case arises out of a contract dispute between plaintiffs, Shenandoah Associates Limited Partnership, Jefferson House Associates Limited Partnership, and Leesburg Manor Associates Limited Partnership, and the Community Management Corporation of Maryland ("CMC"), represented by defendant Tirana.[1] Each of the

1. Benjamin Weitz, the sole managing general partner of the partnerships, was previously the owner of CMC. Weitz sold CMC to two former employees in 1991. Eventually the management arrangement deteriorated and the resulting disputes have been the basis for

partnerships owns one apartment building in Virginia. See Compl. ¶¶ 1–3, 8. Between 1982 and 1989, each partnership designated CMC as the exclusive managing agent for their respective apartment buildings. See id. ¶¶ 9–11. The corresponding management agreements required CMC to deposit rents and other funds into a separate, government-insured account designated in the name of each partnership's respective house-operating account and specified the precise uses of the house-operating accounts. See id. ¶ 13. The agreements between CMC and Shenandoah and Jefferson House required CMC to comply with the U.S. Department of Housing and Urban Development Regulatory Agreement that all funds collected by CMC be kept in trust, separate and apart from CMC's other funds. See id. ¶ 15. For these two agreements, the parties also entered into Management Certifications that required the management agent to turn over all accounts, trust funds and records immediately, but in no event more then thirty days after the termination of the agreements. See id. ¶ 16.

Between October and December 1997, the three partnerships terminated their agreements with CMC, effective January 1998, and instructed CMC to turn over the funds and relevant records from all the trusts and accounts. See id. ¶ 17. At the end of December 1997, Tirana sent letters on behalf of CMC stating that the partnerships had anticipatorily breached and repudiated the agreements and that CMC would pursue available legal remedies. Pl. Mot. for Summ. J. Ex. 33, 34. In February 1998, Tirana sent additional letters explaining that CMC was retaining certain funds from Shenandoah and Jefferson House to cover "management fees and other sums due from the owner[s] to CMC under the management agreement[s] and because of the wrongful termination thereof." Def. Mot. for Summ. J. Ex. 39, 40. CMC also retained funds from Leesburg Manor, although related correspondence does not appear in the record. See Pl. Mot. for Summ. J. at 6.

Plaintiffs allege that CMC retained these funds at the direction of Tirana. Compl. ¶ 23. They also allege that, at that time, CMC was in poor financial shape and did not have sufficient income to pay its legal bills to Tirana.[2] See id. ¶ 25. Eventually, the funds were transferred into CMC's general operating account and the commingled funds were used to pay Mr. Tirana's outstanding legal fees. Pl. Mot. for Summ. J. at 6–11.

The plaintiffs originally alleged three counts of wrongdoing by the defendant: (1) tortious interference with the plaintiffs' contractual rights; (2) conspiracy to convert the plaintiffs' property; and (3) unjust enrichment through acceptance of payment from CMC's general fund. Additionally, the plaintiffs argued that the court should create a constructive trust to prevent Tirana from being unjustly enriched by the partnerships' funds. In an opinion dated August 15, 2001, Judge Ricardo Urbina, who was initially assigned this case, dismissed counts II and III for failure to state a claim and further held that the plaintiffs' were not entitled to the equita-

multiple litigations in Maryland, Virginia and federal Bankruptcy Court, each involving claims, counterclaims and appeals. *See e.g. In re Community Management Corporation of Maryland*, 91 Fed.Appx. 808 (4th Cir.2003).

**2.** The record is unclear whether Tirana practiced law in a law firm, as a solo practitioner or incorporated in any way. It appears to the Court, and the Court will assume for purposes of this opinion, that Tirana was an unincorporated solo practitioner and that any debt owed by CMC to Tirana for legal services will be treated as debt owed to Tirana personally.

ble remedy of the creation of a constructive trust. *See Shenandoah Associates Limited Partnership, et al., v. Tirana,* 182 F.Supp.2d 14 (D.D.C.2001). In his motion for summary judgment on the remaining claim, Tirana argues, *inter alia,* that he was acting as CMC's agent when he provided advice to CMC regarding the management contracts and therefore cannot be treated as a separate party such that he could liable for interference with that contract. The plaintiffs argue in response that Tirana was acting in his own personal interest, rather than the interest of his client, and thus can and should be held liable for this actions regarding the management contracts.

## STANDARD OF REVIEW

Summary judgment is appropriate under Federal Rule 56(c) "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." *Celotex v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Diamond v. Atwood,* 43 F.3d 1538, 1540 (D.C.Cir.1995). The moving party bears the initial burden of identifying the basis of its motion and the pleadings, depositions, answers to interrogatories, admissions on file, or affidavits which is believes demonstrate the absence of material fact. *See Celotex,* 477 U.S. at 323–24, 106 S.Ct. 2548. To determine which facts are material, the Court must examine the substantive law underlying the claim. *See Anderson v. Liberty Law, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A "genuine

issue" is one whose resolution could establish an element of a claim or defense, thereby affecting the outcome of the action. *See Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. Additionally, to be genuine, the issue of fact must be supported by sufficient admissible evidence such that a reasonable trier of fact could find for the non-moving party. *See Laningham v. United States Navy,* 813 F.2d 1236, 1242–43 (D.C.Cir.1987). An adverse party's or non-moving party's mere allegations or denials are insufficient to defeat an otherwise proper motion for summary judgment. Instead, the non-moving party must present, by affidavits or otherwise, specific facts that demonstrate there is a genuine issue for trial. *See id.* at 248–49, 106 S.Ct. 2505. At all times, the Court must construe all evidence presented in favor of the non-moving party. *See Anderson,* 477 U.S. at 255, 106 S.Ct. 2505.

## ANALYSIS

 Under Virginia law,[3] four elements are required to establish a prima facie case of tortious interference with contractual rights:

> "(1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted."

*Chaves v. Johnson,* 230 Va. 112, 335 S.E.2d

---

**3.** Judge Urbina applied this Circuit's conflict of law analysis in his opinion granting in part the motion to dismiss and concluded that the weight of the governmental interests in this case lie with the Commonwealth of Virginia.

*Shenandoah Associates,* 182 F.Supp.2d 14, 18–19 (D.D.C.2001). This Court aggress with his analysis and applies Virginia law in its analysis of defendant's conduct.

97, 102 (1985).[4] In addition, the moving party must prove that it was a third party, not a contracting party, who intentionally interfered with his contract. Where the third party is an agent who is acting within the scope of his agency, he can not intentionally interfere with the contract of his principal. *Fox v. Deese, et al.*, 234 Va. 412, 362 S.E.2d 699, 708 (1987). Thus, as a general rule, "[a] lawyer who advises or assists a client to make or break a contract . . . is not liable to a non client for interference with contract . . . if the lawyer acts to advance the client's objectives without using unlawful means."[5] Restatement (Third) of the Law Governing Lawyers § 57(3) (2003) [hereinafter Restatement].

In this case, neither party disputes that Tirana was acting as CMC's attorney. *See also Virginia Electric and Power Co. v. Bowers*, 181 Va. 542, 25 S.E.2d 361 (1943) (noting that "an attorney is the agent of his client"). However, the partnerships assert that Tirana was acting in his own interest and as a result was acting outside the scope of his agency. Accordingly, the determination of whether to grant summary judgment for the defendant turns upon whether he was acting within the scope of his agency as CMC's attorney. For the following reasons the Court concludes that the defendant was acting within the scope of his employment.

The partnerships argue that there is "undisputed evidence" that Tirana was acting in his own interest and not on behalf of his client, see Pl. Opp. to Def. Mot for Summ. J. at 7. Notwithstanding these allegations, they have offered no direct evidence of Tirana's motives or his actions. Even their allegation that Tirana had a financial interest in encouraging CMC to retain the funds (i.e. alleging $300,000 in outstanding legal fees owed to Tirana) and that Tirana instructed CMC to retain the funds for the purpose of paying those fees,[6] Compl. ¶¶ 25, 33, was not corroborated by the discovery they conducted. To the contrary, Tirana offered evidence, which is uncontroverted, see e.g. Pl. Opp. to Def. Mot. for Summ. J. at 8 n. 2, that there were no outstanding legal bills during the period when the relevant advice

---

4. The Virginia Supreme Court has held that in the case of a contract that is terminable at-will, the third element requires proof not only of intentional interference inducing or causing a breach, but also that the interferor employed improper methods. *See Duggin v. Adams*, 234 Va. 221, 360 S.E.2d 832, 836 (1987). The parties dispute whether the management contracts were terminable at-will and which standard should apply. The Court concludes that it need not decide for purposes of this opinion whether improper methods were required because the plaintiffs have failed to establish a prima facie case that the defendant was acting outside the scope of his agency such that the third element would need to be considered in the summary judgment analysis.

5. In addition, "[t]he lawyer may ordinarily, without civil liability, advise a client . . . to breach an existing contract. A lawyer may also assist in the breach, for example by sending a letter stating the client's intention not to perform . . . ." Restatement § 57 cmt. g.

6. Indeed, very little evidence of Tirana's actual advice is before the Court at all. Tirana testified at a bankruptcy hearing that CMC had requested his opinion as to the funds and that he advised CMC that it had the right to litigate the contract dispute and hold the funds to offset the damages incurred by the termination. Pl. Mot. for Summ. J. Ex. F at 57–58. CMC's principals testified that Tirana advised CMC that it could retain the funds. There is no direct evidence of Tirana's actual advice in the form of notes or a memorandum because Tirana asserted that those materials were privileged and that the privilege was held by CMC's bankruptcy trustee. Pl. Mot. for Summ. J. Ex. F at 57–58. Although the privilege may have been waived, the parties have not briefed the issue and the Court finds that its resolution is not relevant to the summary judgment motions at hand.

was given.[7] Def. Mot. for Summ. J. at 8–9; Ex 27–36. Simply stated, the evidence submitted, when reviewed in the light most favorable to the partnerships, does not raise a genuine issue as to whether Tirana was acting outside the scope of his agency. Tirana submitted bills for services rendered in relation to an ongoing legal battle and there is no allegation that the bills were fraudulent or the work was not performed. See Def. Mot. for Summ. J. Ex 27–36. To the contrary, the evidence indicates that Tirana was paid for performing legal services to aid CMC. As noted in the Restatement, "[s]o long as the lawyer acts or advises with the purpose of promoting the client's welfare, it is immaterial that the lawyer hopes the action will increase the lawyer's fees or reputation as a lawyer or takes satisfaction on the consequences to a nonclient." Restatement § 57 cmt. g.

Finally, the partnerships' argument that Tirana had an "independent stake" in the outcome of CMC's contract dispute is not apposite to the facts in this case. The cases cited by the plaintiffs involve situations in which an officer or agent was positioned to reap a personal benefit *independent* from, and in addition to, the general benefit received by the principal. For example, in *Greenville Publishing Co. v. Daily Reflector*, the Fourth Circuit held that the president of the defendant corporation was capable of conspiring with the corporation because he derived additional income from a third company that would have simultaneously benefited from the conspiracy. 496 F.2d 391, 399–400 (4th Cir.1974). Thus, the "stake" that the corporate officer may have had in that case was "independent" and separate from the general benefit derived by the corporation (and indirectly by its president). In this case, any potential benefit to Tirana in the form of payment for his legal services was completely dependent upon the legal propriety of CMC's retention of the plaintiffs' funds. Thus, the independent stake exception is not applicable to the facts of this case.[8] Accordingly, Tirana's motion for summary judgment is granted and the plaintiffs' motion is denied.

## CONCLUSION

For the reasons set forth above, the Court hereby

**GRANTS** defendant's motion for summary judgment;

---

7. The partnerships' argument in response that Tirana submitted additional bills to CMC in an effort to create a litigation "war chest," Hr'g Tr. at 2, which were eventually paid after the withheld funds had been transferred to and commingled with CMC's general operating account, Pl. Opp. to Def. Mot. for Summ. J. at 8 n. 2; Pl. Mot for Summ. J. at 6–11, is speculative and anemic, at best.

8. The partnerships also argue that this case is analytically the same as *Duggin v. Adams,* a rare case in which an attorney was found liable for tortious interference with the contract of his client. 234 Va. 221, 360 S.E.2d 832, 836 (1987). The Court disagrees. Although the defendant in *Duggin* was an attorney, the conduct underlying that dispute was dramatically different that the conduct that has been alleged in this case. The Supreme Court of Virginia found in *Duggin* that Adams had employed "deceptive, willful, wanton, intentional and malicious conduct" which was "aggravated, unjustified and in utter disregard of [Duggin's] contract rights." *Id.* at 835. Notwithstanding the partnerships' allegation that Tirana's advice was incorrect, no evidence has been offered that Tirana's advice was unlawful, deceptive, or in breach of the standard of care or his ethical duties. It is not enough that the contract terms are disputed; litigation, by definition, involves disputes. In the absence of any evidence that Tirana's purpose was contrary to his client's welfare or that he had a independent stake in his advice other than receiving payment for services rendered, a reasonable juror would have no evidence from which to conclude that Tirana was acting outside the scope of his agency.

12

**DENIES** plaintiffs' motion for summary judgement; and

**ORDERS** that judgment be entered for the defendant and plaintiffs' complaint be dismissed with prejudice.

**SO ORDERED.**