HILB, ROGAL AND HAMILTON COMPANY OF RICHMOND, ETC.

V.

E. FRANKLIN DEPEW, ET AL.

Record No. 930493

February 25, 1994

Present: All the Justices

*Andrea R. Stiles (Robert E. Eicher; Williams, Mullen, Christian & Dobbins,* on briefs), for appellant.

*J. Tracy Walker, IV, (Michael W. Smith; Christian, Barton, Epps, Brent & Chappell,* on brief), for appellee.

JUSTICE WHITING delivered the opinion of the Court.

This action by an employer against its former employee raises issues of (1) the timeliness of the employer's nonsuit of one count of its motion for judgment, and (2) the correctness of the trial court's action in striking the employer's evidence on the remaining counts. Since the court struck the employer's evidence, we will "view the evidence and all reasonable inferences deducible therefrom in the light most favorable to the plaintiff." *Karim v. Grover,* 235 Va. 550, 553, 369 S.E.2d 185, 186-87 (1988).

On September 7, 1990, Hilb, Rogal and Hamilton Company of Richmond (HRH), an insurance sales firm, bought the tangible and intangible assets of The James River Financial Group, Inc. (James River), an employee benefits business. HRH continued the operation of James River's former pension division, which administered pension plan accounts. HRH, as administrator, was compensated at a rate determined by the size of the account.

James River had employed Timothy R. Rash as the "person in overall charge" of this business, Edward Franklin DePew as the head of the pension division of the business, and Edward T. Menster as a salesman in the pension division. HRH employed Rash, DePew, and Menster in the same capacities. DePew and Menster signed employment contracts, each of which contained the following pertinent provisions:

> 5. *EMPLOYEE COVENANTS.* Employee recognizes that over a period of many years the Employer (specifically including for purposes of this paragraph 5 any predecessors of Employer or entities from which it might have acquired insurance accounts) has developed, at considerable expense, relationships with, and knowledge about, customers and prospective customers which constitute a major part of the value of the Employer. During the course of his employment by Employer, Employee will have substantial contact with these customers and prospective customers. In order to protect the value of the Employer's business, Employee covenants and agrees that, in the event of the termination of his employment, . . . he shall not directly or indirectly as an owner, stockholder, director, employee, partner, agent, broker, consultant or other participant, for a period of two (2) years from the date of such termination:

(a) approach, contact or solicit, or continue to allow himself to be approached or contacted by, any individual or firm, which was a Customer . . . (as hereinafter defined) of the Employer . . . for the purpose of offering, obtaining, selling, diverting or receiving, to or from said individual or firm, services in the field of insurance or any other business engaged in by the Employer during Employee's term of employment;

. . . .

As used herein, "Customers" shall be limited to those for whom there is insurance coverage in force as of the date of termination of employment.

As the manager of HRH's pension plan division, DePew had close and almost exclusive contact with many of its customers. The customers involved in this litigation all had contracts with HRH terminable at the will of the customers.

On one of their periodic visits to service an HRH pension plan customer, Womancare, P.C., DePew and Menster persuaded a principal of Womancare, Dr. Camilla M. Buchanan, to withdraw $20,000 of Womancare's pension trust and invest it in International Trading Associates (ITA), a general partnership operated by them.

On March 25, 1991, DePew gave Rash the contractually required 30-day notice that he would terminate his employment in late April. Rash instructed DePew not to advise HRH's pension plan customers of his expected termination. However, during this 30-day period, DePew told one of the customers that he was leaving HRH and also told another customer that he was establishing his own pension plan business.

DePew terminated his employment with HRH on April 24, 1991. After he left HRH, he operated his own pension trust business.[1] Within two years after DePew terminated his employment with HRH, he executed contracts to provide pension plan services to five companies that had been pension plan customers of HRH at the time DePew terminated his employment.

Menster also terminated his employment with HRH at approximately the same time as DePew. Shortly thereafter, he became an "independent contractor" for DePew. At the request of Technology

---

[1] DePew operated his pension trust business as a corporation, MidAtlantic 401(K) Services, Inc.

Associates, Inc. (TAI), one of HRH's customers, in June 1991, Menster and DePew visited TAI in an effort "to attract their business."

HRH filed a motion for judgment against DePew and Menster containing the following four counts: (I) breach of the employment contract; (II) conspiracy to interfere with HRH's contractual relations with its pension plan customers; (III) intentional interference with HRH's business relations with its pension plan customers; and (IV) breach of fiduciary duties as HRH employees.[2]

Menster filed a petition in bankruptcy after HRH's action was filed, and the action was stayed as to him. At a bench trial, after HRH presented its case-in-chief, the court sustained DePew's motion to strike all counts but Count I.

The court then turned its attention to Count I and said:

The provisions of the contract give me some trouble.

In paragraph (a) you say that they won't do these things and they restrict it to that which was a customer hereinafter defined. It says for obtaining, selling, diverting, receiving or from services in the field of insurance. The field of insurance is so broad that I don't have any idea what kind of insurance you're talking about, whether it's automobile insurance, homeowner's insurance, life insurance, accident insurance. In fact, I don't even know exactly what fields of insurance the plaintiff operates in or any other business engaged in by the employer.

You say the customer and you give a definition of a customer for those for whom there is insurance coverage in force at the date of termination of employment. If you read the whole contract together, what you come up with is that he could not solicit business from a customer and that is someone who has insurance coverage in force and insurance coverage in force is not defined. I don't know what kind of insurance coverage we're talking about. To say that an annuity is insurance coverage on the basis that it guarantees an interest rate, seems to me to stretch the point quite a bit.

Just after the court made this statement, HRH moved to nonsuit its breach of contract claim. The court replied that it had already ruled that DePew had not violated the provisions of paragraph 5(a) of the

---

[2] The claim for breach of fiduciary duty was in the last count, which was unnumbered. It was, however, the fourth count and both parties have described it as "Count IV." We will also do so.

employment contract (the noncompetition clause) because "he can't be guilty of soliciting the business from the plaintiff since there is no evidence that the ones who left fit the definition of a customer." Therefore, it denied the motion to nonsuit that part of Count I. However, the court granted the nonsuit as to any remaining cause of action in Count I arising from a breach of any other provision of DePew's employment contract. HRH appeals these adverse rulings.

The nonsuit issue is controlled by Code § 8.01-380(A), which provides in pertinent part that a "party shall not be allowed to suffer a nonsuit as to any cause of action or claim . . . unless he does so *before a motion to strike the evidence has been sustained.*" (Emphasis added.) This Court has repeatedly held that Code § 8.01-380(A) permits a plaintiff to take a nonsuit during the course of the court's explanation of its proposed ruling. *Homeowners Warehouse, Inc. v. Rawlins,* 242 Va. xiii, xiii, 409 S.E.2d 115, 115 (1991); *Newton v. Veney,* 220 Va. 947, 952-53, 265 S.E.2d 707, 710-11 (1980); *Berryman v. Moody,* 205 Va. 516, 518-19, 137 S.E.2d 900, 901-902 (1964) (applying predecessor statute, Code § 8-220). In *Newton,* we said:

> The construction we give the statute is necessary because of the varying practices followed by trial courts, and to avoid confusion and uncertainty. Some judges rule on a motion to strike without explanation or comment. Some rule and then explicate. And some analyze the motion, summarize and discuss the evidence, and then rule. When this last practice is followed a plaintiff is free to suffer a nonsuit at any time prior to a ruling by the court.

220 Va. at 952, 265 S.E.2d at 711.

In this case, as in *Rawlins, Newton,* and *Berryman,* HRH moved to nonsuit during the court's discussion of its proposed ruling, but before it had ruled. Hence, the motion was timely.

Next, in deciding whether the court correctly struck the evidence supporting the remaining counts, we review the following general principles that affect these three causes of action.

One principle is that a tort action exists against "one who intentionally interferes with another's contractual rights." *Duggin v. Adams,* 234 Va. 221, 225-26, 360 S.E.2d 832, 835 (1987). As pertinent to the at-will contracts involved here, the elements of that cause of action are (1) a valid contractual relationship, (2) the interferer's knowledge of that relationship, (3) the use of "*improper* methods" in the inten-

tional interference causing a termination of the contract, and (4) resultant damage to the party whose contract has been disrupted. *Duggin,* 234 Va. at 226-28, 360 S.E.2d at 835-37.

■ Also pertinent to this case is the principle that an employee's fiduciary duty to his employer prohibits the employee from acting in a manner adverse to his employer's interest. *Greenspan v. Osheroff,* 232 Va. 388, 400, 351 S.E.2d 28, 37 (1986); *Horne v. Holley,* 167 Va. 234, 241, 188 S.E. 169, 172 (1936). We applied these principles in *Duggin,* holding that the breach of a fiduciary relationship is evidence of the required improper method. *Duggin,* 234 Va. at 227, 360 S.E.2d at 836. As a logical extension of *Duggin,* we hold that, under certain circumstances, an employee's breach of his/her contractual duties may constitute the "improper method" necessary to sustain a cause of action for intentional interference with an employer's at-will contract and for a conspiracy to interfere with that contract. *See Hechler Chevrolet, Inc. v. General Motors Corp.,* 230 Va. 396, 402, 337 S.E.2d 744, 748 (1985) (defendant may be liable for conspiring to interfere with at-will contract if improper methods used in doing so).

■ Applying those principles to this case, we consider the sufficiency of HRH's evidence in support of Counts II, III, and IV.[3] First, we consider the evidence in support of Count II, alleging DePew's conspiracy to interfere with HRH's at-will contracts with Womancare and TAI. In our opinion, the evidence is sufficient to support the inference: (1) that the contacts DePew and Menster had with Womancare and TAI indicate that DePew and Menster had planned to interfere with HRH's contracts with those parties; (2) that these contacts were in breach either of their fiduciary duties to HRH during employment or their noncompetition clause after employment terminated;[4] and (3) that these activities constituted an "improper method." Hence, the trial court erred in striking the evidence of that claim.

■ We turn next to the claims of intentional interference made in Count III. The trial court concluded that the evidence of the Womancare transaction was insufficient to support a claim under this count because Womancare could withdraw its pension funds "at will."

---

[3] Because of HRH's nonsuit, it cannot recover damages for breach of contract here. Nevertheless, DePew's employment contract should be considered in deciding whether HRH has introduced evidence sufficient to make a *prima facie* case with respect to the remaining counts of its motion for judgment.

[4] Since DePew and Menster contacted TAI after their employment with HRH had terminated, a finding of DePew's use of an improper method is dependent upon evidence that DePew violated the noncompetition clause of his employment agreement. Later in this opinion, we conclude that sufficient evidence was introduced from which such a violation might be inferred.

However, the evidence was sufficient to suggest that DePew intentionally interfered with the Womancare contract by the use of an improper method, *viz,* the breach of his fiduciary duty to HRH, thereby damaging HRH. Thus, the court erred in striking this evidence in support of Count III.

This brings us to consideration of DePew's post-termination activities in alleged violation of the noncompetition clause of his employment agreement. As pertinent, the noncompetition clause provides that DePew will not

> approach, contact, or solicit, or continue to allow himself to be approached or contacted by, any . . . firm, which was a Customer [of HRH when DePew terminates his employment].

The term "Customer" is defined and limited to

> those for whom there is insurance coverage in force as of the date of termination of employment.

DePew argues that the noncompetition clause is inapplicable for two reasons. First, since he did not "approach, contact, or solicit" those former HRH pension trust customers who contracted with him after he left HRH, DePew maintains that he did not violate the noncompetition provision of paragraph 5(a) of his employment agreement. However, the remaining language in that paragraph prohibited DePew from contracting with HRH's customers during the proscribed period, even though the customers themselves solicited the new contracts. Thus, we find no merit in this contention.

Second, DePew contends that the noncompetition clause does not apply to three of the HRH customers because HRH did not have insurance coverage for them when DePew left HRH. DePew recognizes that these customers had annuity contracts with Nationwide Life Insurance Company (the insurance company) that were administered by HRH. Nevertheless, DePew contends that the annuity contracts were not "insurance coverage."

We must decide whether, in the context of this case, these annuity contracts provided insurance coverage. In Virginia, the General Assembly has classified annuities of this type as "insurance." Code § 38.2-101 provides: "Insurance is classified and defined as set out in subsequent sections of this article." And, within that article, Code § 38.2-106 states: " '*Annuities*' means all agreements to make periodic payments in fixed dollar amounts pursuant to the terms of a contract for a stated period of time or for the life of a person or persons

specified in the contract." Code § 38.2-1800 provides: " '*Life and health insurance agent*' means an agent licensed in this Commonwealth to solicit, negotiate, procure, or effect life insurance, annuity contracts, and accident and sickness insurance as defined in [the relevant code sections]."

We note that DePew held state life and health insurance licenses. And we also note that Rash, DePew, and Menster described these annuity contracts as "insurance contracts."

The annuity contracts all contained similar pertinent provisions for employer contributions through the trustee of its 401(k) pension plan to a "Guaranteed Fund" administered by the insurance company.[5] Upon the direction of the pension plan's trustee, the insurance company was required to provide annuities to the individual employees of HRH's pension plan customer. Generally, these annuities provided pension payments to a retired employee for the balance of his life, the amount of which would be determined by the use of a mortality table and the employee's age upon retirement. Thus, the risk of an individual employee's mortality passed to the insurance company; if the employee outlived his or her life expectancy, the insurance company was required to continue the pension payments. Such shifting of the risk is the essence of insurance. *Variable Annuity Life Ins. Co. v. Clarke*, 998 F.2d 1295, 1301 (5th Cir. 1993).

Hence, in the context of this case, we conclude that the annuity contracts were insurance contracts which provided for coverage against the risk that a retired employee would live beyond his life expectancy. Accordingly, the evidence was sufficient to indicate that DePew violated the noncompetition clause in executing pension plan contracts with three of HRH's former customers.

The evidence also indicated that, as a result of losing these customers, HRH was forced to close its pension plan operation as unprofitable, thereby sustaining an additional loss of income when its remaining two pension plan customers could no longer be serviced. Those customers were "customers" as defined in the noncompetition clause since they held property and casualty insurance issued through HRH.

And, we conclude that proof of DePew's violation of the noncompetition clause was *prima facie* evidence of his use of an improper method of interfering with HRH's contracts. Since DePew's

---

[5] In general, 401(k) pension plans benefit employees of a business and qualify for favorable tax treatment to both the employer and the employees under the provisions of Title 26 U.S.C. § 401(k).

knowledge of these contracts and the damage to HRH was also shown, the court erred in striking this evidence in support of the claim in Count III.

■ Turning to the claim of breach of fiduciary duty in Count IV, we note that HRH cites no authority supporting its claim that DePew's post-termination conduct was in violation of his fiduciary duty, and we find none. An employee's duty to his employer not to compete arises out of his relationship to his employer. *Restatement (Second) of Agency* § 393 (1958). Thus, upon the termination of the relationship, the employee may compete with his employer. *Peace v. Conway,* 246 Va. 278, 281-82, 435 S.E.2d 133, 135 (1993). Accordingly, although we conclude that DePew may have violated the noncompetition clause, and he also may have tortiously interfered with HRH's contracts, his post-termination activities were not a violation of a fiduciary duty to HRH. Therefore, the trial court correctly struck the evidence as to his post-termination conduct as it related to Count IV.

For all these reasons, we will reverse the judgment of the court in refusing to grant a nonsuit as to Count I and remand that claim to the trial court with directions to grant a nonsuit. We will reverse the judgment of the court in striking the evidence as to Counts II and III and remand the case for a new trial. We will affirm the judgment of the trial court in granting the motion to strike Count IV.

*Affirmed in part,*
*reversed in part,*
*and remanded.*

JUSTICE LACY concurs in the result.