## CIRCUIT COURT OF THE CITY OF WINCHESTER

Thomas A. Nida

v.

Business Advisory Systems, Inc.

v.

Mortgage Management Corp.,
Michael B. Noble,
Lucy Beaty,
and Richard C. Van Curen

March 2, 1998

Case No. (Law) 95-248

BY JUDGE JOHN E. WETSEL, JR.

This case came before the Court on February 26 and 27, 1998, for trial on the claims of the parties. Plaintiff Nida appeared with his counsel, David A. Downes, Esquire, who also represented the third-party defendant Mortgage Management Corporation; Bruce E. Downing, Esquire, appeared for the Defendant Business Advisory Systems, Inc. (BAS); Third-party Defendants Michael B. Noble, Lucy Beaty, and Richard C. Van Curen appeared in person without counsel.

Nida was a former officer and director of BAS, and he sued BAS for commissions on loans which he claimed were due. BAS filed a counterclaim against Nida claiming breach of fiduciary duty, tortious interference, conspiracy, and breach of contract and third party claims against Mortgage Management, Noble, Beaty, and Van Curen, the latter three of whom were

all formerly associated with BAS. Evidence was heard and argued. At the conclusion of all the evidence and argument, the Court dismissed Lucy Beaty, Richard Van Curen, and Mortgage Management Corporation from this action. Upon further deliberation, the Court has made the following decision that Nida is entitled to recover from BAS the sum of $1,387.50 and that the BAS counterclaim against Nida and the third party motion for judgment against Noble should be dismissed.

## I. *Findings of Fact*

The following facts are found by the greater weight of the evidence.

Business Advisory Systems, Inc., is a Virginia corporation, which has been in business since about 1990 and which was originally formed to provide management and financial services to troubled businesses. In 1992, it decided to enter the business of financing residential mortgages. The year 1993 was a refinancing boom year, but in 1994, the refinancing market dried up. BAS is still in the residential mortgage brokerage business but under different ownership and management.

In 1995, Sylvester was the sole stockholder, president, and chairman of the board of directors of BAS, and had held those positions since he formed the corporation. Sylvester worked for First Federal Savings and Loan for a year in 1977-78; then he began teaching business administration at Shenandoah University, which he left in 1986 to work for the Cumberland, Maryland, Chamber of Commerce. He returned to Winchester in 1988 and started BAS as a sole proprietorship. Before starting BAS's residential mortgage brokerage business in 1992, Sylvester had had very limited experience in the residential mortgage brokerage business, and he had never had a residential mortgage brokerage business prior to that time. To start his mortgage brokerage business, he made inquiries of various lenders and acquired information about lenders and their practices. Sylvester does not recall where he acquired the names and telephone numbers of the lender contacts which he now says is proprietary information which he developed.

Noble was hired as a loan officer by BAS in January 1994, and was elected a vice president and director of BAS on January 11, 1995. He was made a director after he agreed with Sylvester to sign as a personal guarantor on a $25,000 line of credit for BAS.

Nida was hired as a loan officer by BAS in June 1993 and was appointed as an officer and director of BAS in April 1994, and he was chief loan officer for BAS until June 7, 1995. Nida had had extensive banking

and loan experience prior to his association with BAS, including being the president of a bank. See Defendant's Exhibit 8.

When initially hired by BAS, both Nida and Noble signed "Subcontractor Agreements" by which they were purportedly hired as independent contractors. Defendant's Exhibits 5 and 6. These contracts are silent as to what happens to a loan produced by the loan officer if he terminates his association with BAS and as to what happened with the commission on any such loan.

Beaty served as chief loan processor and as loan officer for BAS until July 14, 1995. She had worked in the residential mortgage business since 1989 and began work for BAS in November 1993. Defendant's Exhibit 10. She brought information with her to BAS about lender contacts when she joined BAS, and she took that information with her when she left. She actually left her original Rolodex cards on the BAS Rolodex when she left, and she copied her own Rolodex cards which she had brought to BAS when she was initially employed by it. She had her own personal Fanny Mae and Fanny Mac manuals plus her own lender manuals which she had brought to work with her when she came to BAS, and she took them with her when she left.

Van Curen was hired by BAS in May 1995 as a loan officer and served in that position until July 17, 1995. Van Curen had about twelve years experience in the mortgage brokerage business, and he testified that mortgage brokers generally touted in the market the names of lenders with whom they worked and that that information was not generally confidential in the industry. In February or March 1995, before he went to work for BAS, Chesapeake had approached him about working for them, because they were planning to open an office in Virginia.

Chesapeake Mortgage Consultants, Inc. (hereinafter "Chesapeake") is a Maryland corporation, which is a residential mortgage broker. After leaving BAS, Nida, Noble, and Beaty were associated with Chesapeake for a time, and the circumstances under which they severed their relationship with BAS and became associated with Chesapeake is what has given rise to this action. The residential mortgage brokerage business is a very competitive business, and there are several residential mortgage brokers in the Winchester, Virginia, area. Chesapeake's incursion into the residential mortgage business in Virginia was short lived. After beginning business in July, 1995, Nida left Chesapeake in September 1995, and Van Curen left Chesapeake in February 1996. Thereafter, Noble and Beaty left Chesapeake, and on June 25, 1996, Chesapeake closed its office in Winchester, Virginia.

By the late winter of 1994, Nida and Noble had had differences with Sylvester over business practices, corporate responsibilities, and management styles. BAS was experiencing financial difficulties, and there was attendant strain on everyone. Earlier in 1994, BAS has closed its office in Martinsburg, West Virginia.

In December 1994 and January 1995, BAS was having cash flow problems. Sylvester was considering cutting back on his employees, and incident to those cash flow problems, Sylvester had asked both Noble and Nida to guarantee a $25,000 line of credit. Sherry Renner, the director whom Noble replaced, refused to sign the guarantee and resigned.

The January 6, 1995, Minutes of the BAS Board of Directors referred to a "cash crunch." The corporation was also one quarter behind in its withholding taxes, and Sylvester agreed to lend the corporation funds needed to meet operational expenses "over the next few weeks." Sylvester had represented to Nida and Noble that the $25,000.00 would be used to pay taxes, but instead most of it was used to meet operational expenses, which Sylvester said was justified because of the poor "quality" of the loans produced, particularly those of Nida, which had further compounded the corporation's cash flow problems. The chronic financial problems of BAS persisted during the first two quarters of 1995, and BAS was exploring a possibility of merger with another entity. During the first two quarters of 1995, BAS was also having problems with bank regulators and the FHA. Sylvester characterized 1995, as a "bad year in the residential mortgage business." BAS was Sylvester's corporation, and it did not comply with all the formalities usually associated with the corporate form. The first time that Nida or Noble had ever seen the corporate minutes was when they were produced at trial.

By the spring of 1995, the relationship between Nida and Sylvester had seriously deteriorated, and Nida was exploring other employment opportunities. The relationship between Sylvester and Noble had also deteriorated. Financial difficulties will strain the best of relationships, and BAS's residential mortgage business was foundering. In March or April, Nida told Sylvester that he could not make a living with BAS and that he would probably be leaving.

In early May 1995, Van Curen came to work for BAS under a very casual arrangement as an independent contractor loan officer.

In mid-May 1995, Beaty told Nida that she had heard from a lending underwriter that Chesapeake Mortgage was interested in opening an office in Virginia. Nida followed this lead, and a meeting was scheduled with representatives of Chesapeake in Laurel, Maryland.

On May 31, 1995, Nida and Noble went to Laurel, Maryland, and met with representatives of Chesapeake to discuss Chesapeake's entry into the Virginia mortgage brokerage business.

On June 5, 1995, Nida and Noble met in the conference room of the building which Nida owned in Front Royal, Virginia, and compared their notes and impressions about their meeting with Chesapeake. Beaty said that she heard them talking and sat down and listened to their conversation, and that they did not object to her doing this. This Front Royal building also housed BAS's office in Front Royal. Nida says that Beaty was not excluded from this meeting, because she had provided the initial contact with Chesapeake Mortgage. After either this meeting or incident to the trip to Laurel, Noble told Nida that he would run some figures to determine the financial viability of an independent Chesapeake office in Virginia.

At or following the June 5, 1995, meeting, Nida and Noble agreed that they were both interested in pursuing the prospect of an association with Chesapeake, but neither of them had made a definite decision by then to leave BAS or to go with Chesapeake.

On June 6, 1995, Sylvester asked Nida to backdate some checks to customers for overcharges on loan fees on loans which had been closed and on which an audit of state banking officials had disclosed overcharges to BAS's customers. The bank examiners were then present at the office. Sylvester said that he requested Nida to sign the checks so that Nida could experience some of the "pain," because Sylvester attributed a significant amount of his problems with the auditors to Nida, Noble, and Beaty. Nida had not previously signed checks to customers, and Nida refused to sign the checks and left the office in a "huff." Nida then returned to his office in Front Royal and immediately sent a letter to Chesapeake.

In his June 6, 1995, letter to Chesapeake, Nida set forth a specific proposal to open an office in Virginia for them. Defendant's Exhibit 7. This letter extensively describes the Nida and Noble business plan. The lenders listed on page 2 of this letter were all lenders with whom BAS worked, and the description on page 2 of this letter is a general description of the business of BAS, although Nida said it was a description of his personal business experience with the Nida corporation, his separate corporation which he formed in 1992 to provide financial advisory services to commercial clients, and that any similarity was coincidence. The breadth and content of this June 6, 1995, letter indicate that Nida had given considerable thought to the prospect of opening an independent mortgage brokerage office. Its detailed contents belie hasty preparation.

After June 6, 1995, Noble undertook an investigation of potential office sites in Winchester, Virginia, for the new enterprise. During this time, Noble took a beach vacation with his parents, and he was very infrequently in the BAS office.

Between June 5 and June 22, 1995, Nida had no contact with either Beaty or Van Curen with respect to the potential association with Chesapeake.

On June 7, 1995, Nida resigned as an officer and director of BAS. Plaintiff's Exhibit 18. Thereafter, he remained as a loan officer. At this time, no definite agreement had been reached between Nida and Chesapeake. Given Nida's resignation as an officer and director, Sylvester knew that Nida was planning to leave BAS, so Sylvester decided to close the loan processing function in Front Royal and consolidate that function in BAS's Winchester office.

On June 12, 1995, Nida resigned from all association with BAS effective June 26, 1995, and his last day of work at BAS was on June 22, 1995.

On June 12, 1995, Van Curen began work as a part time compliance officer. Defendant's Exhibit 36. This is the only written contract of association between Van Curen and BAS.

On June 14, 1995, Nida went to Chesapeake's Laurel, Maryland, office and met with Joyce Melbourne of Chesapeake for further negotiations about their potential association.

On June 15, 1995, Nida wrote a letter to Melbourne of Chesapeake in which Nida set forth the names of his contacts at various lenders. Defendant's Exhibit 11. Sylvester claims that this was proprietary information of BAS.

By June 19, 1995, a draft agreement of association was being discussed by Nida and Chesapeake.

June 22, 1995, was Nida's last day at work at BAS, and as of that date, he had never had any discussion with Beaty or Van Curen about his potential association with Chesapeake Mortgage, nor had he ever asked them to join him at Chesapeake.

On July 5, 1995, Nida returned to Virginia from a week long Caribbean cruise.

On July 10, 1995, Beaty resigned from BAS, and her last day of work at BAS was on July 14, 1995.

On July 11, 1995, Noble resigned from BAS and then told Nida that he had resigned. Later on that day, Nida and Noble went to Laurel, Maryland, and finalized the terms of their association with Chesapeake Mortgage.

Sometime shortly after July 11, 1995, Beaty approached Nida and asked whether she could work for him, and he said yes, and after July 14, 1995, Beaty went to work for Chesapeake on a part time basis as a loan processor.

Nida and Noble did not initiate any contact with any of the customers whose loans he closed after leaving BAS. These customers, Defendant's Exhibit 22, shifted their accounts to Chesapeake Mortgage on their own initiative. BAS signed releases on all but one of these loans.

Defendant's Exhibit 22 is a list of eleven customers who had filed an application with BAS but whose loans were closed by Chesapeake's new Virginia office. All of these eleven, but one, had some prior or personal relationship with Nida, Noble, or Van Curen. For example, Kesner was Noble's mother-in-law; Noble and Whitlock were long time friends and bowled on the same bowling team; Blanton was a friend of Nida; Butler worked with Nida's wife; and Van Curen and Galligan went to the same church.

On July 13, 1995, Van Curen learned that Noble and Nida were leaving BAS and forming a new mortgage brokerage company, and later that day Van Curen went to Noble's house; both Noble and Nida were there. Van Curen asked Noble and Nida where they were going, and Noble and Nida said Chesapeake Mortgage, but no offer of employment with Chesapeake was made at that time to Van Curen.

On July 14, 1995, Van Curen told Sylvester that he was resigning from BAS effective July 31, 1995. He then called Nida and told him that he had resigned and asked Nida if Nida had a place for him, and Nida said yes. That evening Van Curen processed a loan application for Chesapeake. Defendant's Exhibit 26.

On July 15, 1995, Sylvester called Van Curen and told him that he was not to return to work at BAS. During the entire time that Van Curen worked for BAS, he received no compensation.

Nida did not solicit either Beaty or Van Curen to work for him; they followed him to Chesapeake of their own volition.

Third party Defendant Mortgage Management Corporation is a Delaware corporation, formed by Nida and Noble on July 18, 1995, to support the new Chesapeake mortgage business which Nida and Noble entered.

On July 15, 1995, after the departure of Nida, Noble, Beaty, and Van Curen, BAS still had five full time or part time loan officers and one former loan processor working for it.

As of the time that Nida left BAS, Nida was owed commissions and some expenses which he had advanced. BAS is due some credits against those commissions.

| | | |
|---|---|---|
| Commissions | $6,461.63 | |
| Plus: Advanced expenses | 809.14 | |
| Net due Nida from BAS | | $7,270.77 |
| Less: BAS Expenses | $3,112.00 | |
| Payment | 2,771.27 | $5,883.27 |
| Net Commissions due Nida | | $1,387.50 |

See Plaintiff's Exhibit 12. So Nida is owed an additional payment of $1,387.50 from BAS.

It was not proven that either Nida, Noble, or Beaty actually took any confidential or proprietary BAS information or personal property, such as loan manuals, with them when they left BAS.

In May 1996, Sylvester sold all his stock in BAS.

## II. *Conclusions of Law*

### 1. *Breach of Fiduciary Duty*

An employee's fiduciary duty to his employer prohibits the employee from acting in a manner adverse to the employer's interest. *Hilb, Rogal and Hamilton Co. v. DePew*, 247 Va. 240, 440 S.E.2d 918, 921 (1994); *Greenspan v. Osheroff*, 232 Va. 388, 400, 351 S.E.2d 28, 37 (1986).

As directors and officers of BAS, Noble and Nida had a fiduciary duty to the corporation to act in good faith in the best interest of the corporation. Virginia Code § 13.1-690. They had the same duties of fidelity in dealing with the corporation as between a trustee and a beneficiary of a trust. A director of a private corporation cannot directly or indirectly, in any transaction in which he is under a duty to guard the interest of the corporation, acquire any personal advantage or make any profit for himself. *Giannotti v. Hamway*, 239 Va. 14, 387 S.E.2d 725 (1990).

"It is a cardinal principle that a director or an officer of a corporation may not be permitted to make a secret profit out of his official position; he must give the corporation the benefit of any advantage which he has

thereby obtained." 18B Am. Jur. 2d, *Corporations*, § 1713. This principle applies to that situation where a business opportunity, which properly belonged to the corporation, has been usurped by a director or officer. However, the instant case is one in which a competitor entered the market, and the issue is the propriety of Nida's and Noble's severance of their official relationship with BAS prior to their joining Chesapeake, and whether they acted improperly with respect to their loan customers.

While it is true that the "the officers and directors of a going solvent corporation cannot engage in a competing business to the detriment of the corporation which they represent," 18B Am. Jur. 2d, *Corporations*, § 1712, a former officer or director is not precluded from forming and engaging in a competing business, absent an enforceable covenant not to compete.

As noted in 18B Am. Jur. 2d, *Corporations*, § 1713:

> The fact that one was once a director or an officer of a corporation does not preclude his engaging in a business similar to that conducted by the company. It is said that it is a common occurrence for corporate fiduciaries to resign and form a competing enterprise and that unless restricted by contract; this may be done with complete immunity, because freedom of employment and encouragement of competition generally dictate that such persons can leave their corporation at any time and go into a competing business. It is recognized that in doing so they can use in their own enterprise the experience and knowledge they gained while working for their former corporation, and that they can, at least in the absence of a contract provision to the contrary, solicit the customers of their former corporation for business unless the customer list is itself confidential.

In this case, there were preliminary discussions prior to June 5, 1995, in which Nida and Noble explored the feasibility of an association with Chesapeake. Nida did not finalize that arrangement until after he had both resigned as an officer and director of BAS on June 7, 1995, and as a loan officer on June 12, 1995. Thereafter, Nida was simply an independent loan officer who had a contract with BAS, but who had given notice that he was leaving. Nida was the laboring oar with respect to the negotiations with Chesapeake, and Noble followed along with him. Noble probably should have resigned as an officer and director before he went on vacation in June, but he did not. However, it has not been shown that BAS was damaged as a

result of that action or by any failure by Noble to tell BAS what he and Nida were doing with respect to the Chesapeake negotiations.

The negotiations with Chesapeake and the finalization of the arrangement with Nida and Noble essentially took about thirty to forty-five days, during which time both Nida and Noble were on vacation for a week. Nida did about all he could under the circumstances to sever his relationship with BAS before forming one with Chesapeake. Noble could have done more, which is probably a reflection of their respective degrees of experience and knowledge of corporate matters. The severance of their respective relationships with BAS may not have been as antiseptic as can be formulated in the abstract, but in the real world of deteriorating economic relationships, it was not proven that a breach of fiduciary duty occurred which damaged BAS. Sylvester said that had he been told, he would have fired them both.

After Nida resigned from BAS as an officer and director on June 7, 1995, he owed no fiduciary duty by virtue of those positions, and his only association with BAS after that was under the independent contractor agreement, and there was nothing in that agreement which precluded his leaving BAS and his loan customers following him. By June 19, 1995, it was probable that Nida was leaving BAS, and BAS knew that. However, it was also probable that he was going to Chesapeake, and that Noble was aware of that fact, and he may have had a duty to disclose that fact as well as the fact that he was probably going to go with Nida since he was still an officer and director of BAS, but there is no proof that Noble's failure to convey that information caused BAS any damage. Assuming that it had been conveyed in or around June 15 to 19, BAS would have terminated Noble three weeks before Noble terminated his relationship with BAS on July 11, 1995. Whenever a fiduciary possesses information and the withholding of that information will damage the corporation, it is the duty of the fiduciary to fully disclose these facts to the corporation, which includes a forthcoming loss of key employees. Here, no damage was proved.

## 2. Breach of Contract

In this case the "Subcontractor Agreement" between Nida (Defendant's Exhibit 5) and Noble (Defendant's Exhibit 6) did not contain an enforceable covenant not to compete. Both contracts were silent about what happened to a loan in process at the time of termination of the contract. Paragraph 6 of both contracts contained the following provision:

Subcontractor will not now, or at any time within five years of the date of this agreement, provide or attempt to provide independent services to any of the Contractor's clients, lenders, investors, *and/or active prospects as of this date*, or in any way to claim any alliance with Contractor, other than those specific projects assigned by Contractor. [Emphasis added.]

Nida and Noble did not contact any of the customers that followed them to Chesapeake, and none of those customers (clients or active prospects) were customers of BAS as of the time that Nida and Noble entered their respective contracts, so the Subcontractor Agreements do not preclude their providing services to those eleven customers listed in Defendant's Exhibit 11. As a practical matter, only six loan customers followed Nida (Blanton, Butler, Seals, Hutchins, Foster, and Suddeth) to Chesapeake, and only two followed Noble (Whitlock and Kesner) so their followings were not great.

Insofar as paragraph five and six purport to be restrictive covenants precluding Nida and Noble from "providing independent services" to lenders that BAS was servicing when Nida and Noble signed their respective contracts, the prohibitions are not enforceable because they are not limited to a reasonable geographic area.

"Since the restraint sought to be imposed restricts the employee in the exercise of a gainful occupation, it is a restraint of trade, and it is carefully examined and strictly construed before the covenant will be enforced." *Clinch Valley Physicians, Inc. v. Garcia*, 243 Va. 286, 289 (1992), *quoting with approval Linville v. Servisoft of Va.*, 211 Va. 53, 55, 174 S.E.2d 785 (1970). Covenants not to compete "are not favored in the law, and courts are slow to grant injunctive relief." *Stoneman v. Wilson*, 169 Va. 239, 245, 192 S.E. 816 (1937).

In *New River Media Group, Inc. v. Knighton*, 245 Va. 367, 371, 429 S.E.2d 251 (1993), the Supreme Court stated:

In determining whether a noncompetition agreement is valid and enforceable, we apply the following criteria:

(1) Is the restraint, from the standpoint of the employer, reasonable in the sense that it is no greater than is necessary to protect the employer in some legitimate business interest?

(2) From the standpoint of the employee, is the restraint reasonable in the sense that it is not unduly harsh and oppressive in curtailing his legitimate efforts to earn a livelihood?

(3) Is the restraint reasonable from the standpoint of a sound public policy?

*Roanoke Eng. Sales v. Rosenbaum*, 223 Va. 548, 552, 290 S.E.2d 882, 884 (1982); *accord Blue Ridge Anesthesia v. Gidick*, 239 Va. 369, 371-72, 389 S.E.2d 467, 468-69 (1990); *Richardson v. Paxton Company*, 203 Va. 790, 794, 127 S.E.2d 113, 117 (1962). Therefore, a noncompetition agreement that passes this three-part test, "in the light of the facts of each case," will be enforced in a court of equity. *Gidick*, 239 Va. at 372, 389 S.E.2d at 469; *Rosenbaum*, 223 Va. at 552, 290 S.E.2d at 884.

In this case, the covenant not to compete prohibits the employee from providing independent services to a lender anywhere in the world. Therefore, it is overbroad and failed the first requirement that it be no greater than is necessary to protect the employer's business. *See, e.g. Richardson v. Paxton*, 203 Va. 790, 127 S.E.2d 113 (1993). In Virginia provisions contained in a contract may be severable and enforced separately or excised from the contract and the remainder of the contract enforced. *See Reistroffer v. Person*, 247 Va. 45, 439 S.E.2d 376 (1994) (provision regarding attorney's fees was severable); *see also Vega v. Chattan Assoc.*, 246 Va. 196, 435 S.E.2d 142 (1993). Whether contractual provisions are severable is determined from the intention of the parties. *Escher v. Escher*, 146 Va. 417, 422, 131 S.E.2d 800 (1926).

However, there is a difference between severing an entire provision and enforcing the balance of the contract and rewriting or "blue penciling" the restrictive covenant to a reasonable scope. In *Roto-Die v. Lesser*, 899 F. Supp. 1515 (W.D. Va. 1995), *citing Grant v. Carotek*, 737 F.2d 410 (4th Cir. 1984), the court refused to blue pencil the covenant not to compete. Generally, Virginia courts do not rewrite the parties contract for them.

The Subcontractor Agreements of Noble and Nida provided that:

Subcontractor will not now, nor any time in the future, divulge, either verbally, in writing, or in any other manner, information which is proprietary to the Contractor's business, to include, but not limited to: Information regarding Contractor contracts, Investor sources [lenders] or any other operational information. Any information located within the Contractor's office is considered proprietary and is not to be passed to any other person without specific consent of the Contractor. Subcontractor will not use any said proprietary information independently of Contractor for his/her per-

sonal business gain at any time, now or in the future, and Subcontractor must seek permission to remove any documents of any nature from Contractor premises. Breach of this provision will result in the immediate dismissal of Subcontractor.

Nida should not have revealed the names of BAS's primary lenders in his letter of June 6, 1995, (Defendant's Exhibit 7), nor the specific information about lender contacts set forth in Defendant's Exhibit 11. However, as a practical matter this is only the names of seven lenders and the name and telephone number of the personal contact at the lender, and certainly, the average person could remember the names of the lenders and the name of the contact, so that after leaving they could call the lender, ask for the personal contact, and get their telephone number. The lenders names are on deeds of trust recorded at the court house, and a list of persons with whom an individual has worked is typically included in a personal resume. Most importantly to the court's decision, it was not proven with the required specificity that BAS suffered any damage as a result of Nida's disclosing or using this lender contact information.

If the targeted profit margin of 2.5% is proprietary, it should not have been disclosed. The financial projections attached to Nida's June 6, 1995, letter are very general and could easily be produced from memory. They were not accompanied by any underlying data. Here again, there was no damage to BAS.

BAS did not prove a material breach of paragraph 5 of the Subcontractor Agreements by Nida and Noble. As found earlier, paragraph 6 is not enforceable, so there was no prohibition against a customer following one of the subcontractors to the new entity and having his loan closed there, as by done by Chesapeake. See Defendant's Exhibit 22.

### 3. Conspiracy

To recover in an action for conspiracy to harm a business, the plaintiff must prove (1) a combination of two or more persons for the purpose of willfully and maliciously injuring plaintiff in his business, and (2) resulting damage to plaintiff. *Allen Realty Corp. v. Holbert*, 227 Va. 441, 318 S.E.2d 592 (1984); *Meadow Ltd. Partnership v. Heritage Sav. & Loan Ass'n*, 639 F. Supp. 643 (E.D. Va. 1986). Proof of civil conspiracy must be shown by clear and convincing evidence. *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 108 F.3d 522 (4th Cir. 1997); *Pierce Oil Co. v. Voran*, 136 Va. 416, 430, 118 S.E. 247 (1923). "Any two or

more persons who combine, associate or mutually undertake together for the purpose of willfully and maliciously injuring another in his . . . trade, business or profession by any means whatsoever" shall be liable civilly for treble damages. Virginia Code §§ 18.2-499 and 18.2-500. These statutes "merely require the proof of legal malice, i.e., that . . . [the defendant] acted intentionally, purposely, and without lawful justification." *Commercial Business Systems v. BellSouth*, 249 Va. 39, 47 (1995). The BAS corporate vessel was foundering, and Nida and Noble explored a new employment opportunity together. The elements of statutory conspiracy have not been proven by clear and convincing evidence.

A common law conspiracy consists of two or more persons combined to accomplish by some concerted action some criminal or unlawful purpose or some lawful purpose by unlawful or criminal means. *Hechler Chevrolet v. General Motors Corp.*, 230 Va. 396, 337 S.E.2d 744 (1985). The foundation of a civil action of conspiracy is the damage caused by the acts committed in furtherance of the conspiracy. *CaterCorp, Inc. v. Catering Concepts, Inc.*, 246 Va. 22, 431 S.E.2d 277 (1993). Common law conspiracy has not been proven.

### 4. Tortious Interference

"It is generally held that a person who maliciously entices an employee in the actual service of an employer to desert and quit his service, to the injury of the employer, is liable in damages to the latter for such injuries as naturally flow from the loss of the employee." 45 Am. Jur. 2d, *Interference*, § 46. However, in this case, Nida and Noble together explored the economic opportunity of associating with Chesapeake, and Beaty and Van Curen came to them after Nida and Noble had severed their respective relationships with BAS.

BAS also claims that the defendants tortiously interfered with its contracts with its customers. The facts of this case illustrate the importance of a thorough understanding of the tort of tortious inference and the myriad contexts in which it may arise. It is important to note that it is an economic tort designed to punish both unlawful and sharp *competitive* business practices, and it generally arises in circumstances where one wrongfully expropriates a business opportunity for himself or improperly intervenes in another's business relationships to expand his own business. Accordingly, its purview may wax and wane with the business mores of the times. As the editors of 45 Am. Jur. 2d, *Interference*, § 1, state:

Generally, the theory of the tort of interference is that the law draws a line beyond which no member of the community may go in intentionally intermeddling with the business affairs of others.

Not every interference is actionable; the fact that defendant's activity has injured plaintiff's business does not mean that plaintiff necessarily is entitled to a remedy. An injury may be of the kind which, in a relatively free economy, a citizen is obliged to suffer, an injury resulting from lawful competition of which he cannot complain. The courts take the position that if means of competition are fair, advantage should remain where success has put it, but if acts complained of do not rest on some legitimate interest or if there is sharp dealing or overreaching or other conduct below the behavior of fair men similarly situated, the ensuing loss should be redressed.

Where interference has been charged for an act lawful in itself, whether there is a right to recover is determined by balancing the interests of the defendant in doing his otherwise lawful act and of the plaintiff in being free from interference. It is necessary to balance the importance, social and private, of the objective advanced by the interference against the importance of the interest interfered with, considering all circumstances, including the method and means used and the relation of the parties.

*A principal factor in striking the balance between permissible behavior and interference is the varying ethical standards of the community, and especially the standards of business ethics. Accordingly, because the standards of business ethics move up and down, the line of demarcation between permissible behavior and interference is not always distinct but varies from time to time. Therefore, in connection with the tort of interference, precedents are only suggestive,* not conclusive, and the fact that a situation is one in which a remedy for interference has never previously been granted does not deter the courts from granting a remedy.

The Supreme Court recently noted the tension between the various types of permissible conduct in a competitive market and the boundaries of the tort of tortious interference in *Maximus, Inc. v. Lockheed Information Systems Co.*, 254 Va. 408 (1997) ("[l]iability determinations . . . [in tortious interference cases] . . . involve balancing of interests.")

In the instant case, BAS claimed that Nida, Noble, and Van Curen tortiously interfered with its contracts with its loan customers. As noted ear-

lier, in every case but one Nida, Noble, and Van Curen had a close personal relationship with the customers who followed them to Chesapeake. There was no written prohibition against the customers following the three to their new venture, and BAS has not proved that any of the three induced the customers to leave or did anything improper in the transfer of the customers from BAS to Chesapeake.

*Duggin v. Adams*, 234 Va. 221, 226-28, 360 S.E.2d 832 (1987), illustrates the apogee of the tort of interference, and it seems to be the wellspring of the current flood of interference actions. In that case the plaintiff claimed that the Defendant, as the seller's attorney, used confidential information to purchase property for himself. The Virginia Supreme Court, which was apparently piqued by the attorney's reprehensible conduct (there was a dissent), reversed the trial court's sustaining of the defendant's demurrer and in doing so appears to have expanded the doctrine of interference to the broadest extent currently recognized in the United States; nonetheless, the court does not find that Nida or Noble engaged in any of the improper conduct mentioned in *Duggin*, they were simply acting in their own economic self interests to find alternative employment.

### Ruling

Nida shall recover $1,387.50 from BAS on his motion for judgment.

BAS shall not recover from Nida or Noble on its third party motion for judgment against Noble and its counterclaim against Nida.