# COURT OF APPEALS OF VIRGINIA

### Record No. 1192-25-3

DAVID WAYNE HOPKINS
v.
DAN RYAN

Present: Judges Causey, Raphael and Duffan
Argued at Lexington, Virginia

Opinion Issued June 23, 2026

## FROM THE CIRCUIT COURT OF THE CITY OF ROANOKE
Leisa K. Ciaffone, Judge

(Thomas E. Strelka; Virginia Employment Law, on brief), for appellant. Appellant submitting on brief.

D. Paul Holdsworth (Adam L. Lounsbury; Jackson Lewis P.C., on brief), for appellee.

## PUBLISHED OPINION BY
## JUDGE STUART A. RAPHAEL

David Hopkins appeals the trial court's final order sustaining a demurrer and dismissing his claims against his supervisor, Dan Ryan. Hopkins alleged in his amended complaint that Ryan (1) tortiously interfered with his expectation of future commissions when Ryan undertook a scheme to divert them to himself, and (2) defamed him through use of a false invoice that prompted one of his best clients to stop working with him. As the amended complaint alleged sufficient facts to support both claims, we reverse. Although a principal's agent generally cannot tortiously interfere with the principal's contract, there is an exception when the agent acts outside the scope of his employment. The alleged scheme by Ryan to sabotage Hopkins and to enrich himself fits that exception. Hopkins's allegations at the pleading stage also suffice to show that the false and misleading invoice at the heart of Ryan's scheme could qualify as a defamatory

communication of and concerning Hopkins. So we reverse the judgment and remand this case for further proceedings.

## BACKGROUND

As this case comes to us on review of the trial court's decision sustaining a demurrer, we assume as true all the factual allegations alleged in the plaintiff's complaint. *Theologis v. Weiler*, 76 Va. App. 596, 600 (2023). "[W]e also accept as true unstated inferences to the extent that they are *reasonable*," but "we give them no weight to the extent that they are *unreasonable*." *Patterson v. City of Danville*, 301 Va. 181, 197 (2022) (quoting *Doe ex rel. Doe v. Baker*, 299 Va. 628, 641 (2021)).

The operative pleading here is Hopkins's amended complaint. Hopkins alleged that he had been employed by Consolidated Electrical Distributors, Inc. ("CED") as a sales representative from 2015 until his forced resignation in May 2023. CED is an electrical wholesale-distribution company with 4,000 employees nationwide and 16 physical locations in Virginia. Ryan was Hopkins's "direct supervisor" in the Roanoke office.

Hopkins was responsible for selling wholesale distribution products, show products, and energy products. His responsibilities included working with contractors and building relationships with customers. His reputation within the industry was "paramount." He "spent years developing trust and goodwill with numerous customers, stakeholders, and third parties due to his hard work and high performance."

Through his "years of hard work" at CED, Hopkins cultivated various "high-paying" customer accounts in his sales portfolio. His employment arrangement with CED "guaranteed" that Hopkins would receive earned commissions on his sales. His "entire take-home revenue was dependent on sales commissions."

Hopkins's working relationship with Ryan began to deteriorate during the COVID-19 pandemic over their disagreement about unstated "personal and private health decisions" by Hopkins and his family. As a result, Ryan allegedly "developed a malicious animus" toward Hopkins. Hopkins claims that Ryan concocted "a plan by which he could ruin . . . Hopkins economically and critically injure his reputation in the industry."

Beginning in the fall of 2022, Ryan allegedly began "transferr[ing] high-paying accounts from . . . Hopkins'[s] sales portfolio to his own." Doing so was "outside the scope of . . . Ryan's employment with CED. No business reason justified or required the transfer of these accounts." Ryan acted "to wrongfully interfere with . . . Hopkins'[s] economic and business interests" and "seek inappropriate economic gain" for himself, thus "reap[ing] economic rewards owed to . . . Hopkins."

One of Hopkins's largest clients alleged to have become ensnared in Ryan's scheme was "Company C." Hopkins had developed a deep and close relationship with Company C and its management, earning more than $100,000 in commissions. Hopkins had also secured an agreement that "sealed" Company C's commitment to buy products from CED for an apartment-development project, a deal worth $1.8 million in revenue to CED.

Ryan allegedly set out to destroy Hopkins's reputation with Company C and to divert the commissions to himself. In January 2023, Ryan caused a shipment of new parts to Company C to be replaced with a shipment of "used" and "defective" parts. To cast blame on Hopkins, Ryan "created a false purchase document" that Ryan "published . . . to third parties to intentionally harm . . . Hopkins." The purchase document was false because the product codes and quantities that Ryan put on the document identified "new inventory, not defective products." Ryan also included an invoice number on the document that connected it to Hopkins. Hopkins alleges that "Ryan intended this forged instrument to be passed off as the work product of . . . Hopkins, thus

harming" his reputation. Hopkins included a photograph of the false invoice in paragraph 30 of the amended complaint.

According to Hopkins, the scheme worked. Believing that Hopkins caused the defective-parts shipment, Company C refused to deal any further with him, including on the apartment-development project. Company C's management told its employees that they would be fired if they bought any products from CED through Hopkins. Thus, Hopkins allegedly lost out on the commissions he would have earned if Ryan had not ruined his professional reputation.

Although Hopkins reported Ryan's misconduct to Ryan's superiors at CED, they allegedly took no corrective action. So Hopkins had no choice but to resign. Hopkins alleges that, after Ryan destroyed his reputation, he found alternate employment outside the United States.

Hopkins claimed in Count I of the amended complaint that Ryan tortiously interfered with his economic and business expectancies in his commissions. He alleged in Count II that the false invoice distributed by Ryan in January 2023 duped Company C "into purchasing defective materials," a scheme perpetrated by Ryan to harm Hopkins's reputation. Hopkins sought damages of $10 million and demanded a jury trial.

The trial court sustained Ryan's demurrer and dismissed the amended complaint with prejudice. In a seven-page opinion, the trial court found that Hopkins had failed to state a tortious interference claim because he failed to allege sufficient facts to show (1) a protected interest in future commissions; (2) that Ryan used an "improper method"; (3) that Ryan was "an outsider or a stranger to the . . . expectancy"; and (4) that Ryan knew about Hopkins's commissions expectancy from Company C's apartment-development project. The court dismissed the defamation claim because (1) the false invoice was not a defamatory statement;

(2) Hopkins did not plead the defamatory statement "*in hac verba*"; (3) the invoice did not refer to Hopkins; and (4) the invoice carried no defamatory "sting." Hopkins appeals.

ANALYSIS

We consider "de novo," *Theologis*, 76 Va. App. at 603, whether the amended complaint stated viable claims for (1) tortious interference with business expectancy, and (2) defamation.

*A. The trial court erred in dismissing the tortious-interference claim.*

In *Chaves v. Johnson*, 230 Va. 112 (1985), the Supreme Court characterized the cause of action for "tortious interference with contract rights" as having been "succinctly described in [the] Restatement (Second) Torts § 766 (1977)." 230 Va. at 120; *see also Shoemaker v. Funkhouser*, 299 Va. 471, 479 n.2 (2021) (noting that *Chaves* "rel[ied] on the Restatement (Second) of Torts § 766 to outline the contours of a cause of action for tortious interference with contract rights"). Section 766 of the Restatement (Second) of Torts states:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

*Chaves*, 230 Va. at 120 (quoting Restatement (Second) of Torts § 766).

Two years later, the Court in *Duggin v. Adams*, 234 Va. 221 (1987), recognized a cause of action for tortious interference with business expectancy in a case involving a contract that was terminable at will. *Id.* at 226. The Court explained that "[u]nlike a party to a contract for a definite term, . . . an individual's interest in a contract terminable at will is essentially only an expectancy of future economic gain, and he has no legal assurance that he will realize the expected gain." *Id.* "Until a party terminates an at-will contract, it is 'valid and subsisting, and [a third party] may not *improperly* interfere with it.'" *Id.* at 227 (alteration in original) (quoting Restatement (Second) of Torts § 766 cmt. g).

*Duggin* emphasized that a plaintiff asserting a tortious-interference-with-business-expectancy claim must show that the defendant used "*improper* methods." *Id.* (quoting *Hechler Chevrolet, Inc. v. Gen. Motors Corp.*, 230 Va. 396, 402 (1985)). Improper methods include but are not limited to methods that are independently tortious:

> Methods of interference considered improper are those means that are illegal or independently tortious, such as violations of statutes, regulations, or recognized common-law rules. Improper methods may include violence, threats or intimidation, bribery, unfounded litigation, fraud, misrepresentation or deceit, defamation, duress, undue influence, misuse of inside or confidential information, or breach of a fiduciary relationship.
>
> Methods also may be improper because they violate an established standard of a trade or profession, or involve unethical conduct. Sharp dealing, overreaching, or unfair competition may also constitute improper methods.

*Id.* at 227-28 (citations omitted). The Court has repeated that description of "improper methods" many times.[1] In *Maximus, Inc. v. Lockheed Information Management Systems Co.*, 254 Va. 408 (1997), the Court reiterated that it had "identified actions as improper [that] are not themselves tortious or illegal, such as unfair competition or unethical conduct. . . . 'Tortious interference' means only that the interference was intentional and improper under the circumstances, not that the 'improper methods' used were inherently illegal or tortious." *Id.* at 414.

The Court framed the elements of a tortious-interference-with-business-expectancy claim by again turning to the Restatement (Second) of Torts, this time to § 766B:

> One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of

---

[1] *See Dunlap v. Cottman Transmission Sys., LLC*, 287 Va. 207, 216 n.5 (2014); *Preferred Sys. Sols., Inc. v. GP Consulting, LLC*, 284 Va. 382, 404 (2012); *Lewis-Gale Med. Ctr., LLC v. Alldredge*, 282 Va. 141, 149-50 (2011); *Dunn, McCormack & MacPherson v. Connolly*, 281 Va. 553, 559 (2011); *Maximus, Inc. v. Lockheed Info. Mgmt. Sys. Co.*, 254 Va. 408, 414-15 (1997).

(a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or

(b) preventing the other from acquiring or continuing the prospective relation.

*Id.* (quoting Restatement (Second) of Torts § 766B). From that foundation, *Maximus* distilled the following elements:

[T]o establish a prima facie cause of action . . . , [the plaintiff] [is] required to show that: (1) it had a contract expectancy; (2) [the defendant] knew of the expectancy; (3) [the defendant] intentionally interfered with the expectancy; (4) [the defendant] used improper means or methods to interfere with the expectancy; and (5) [the plaintiff] suffered a loss as a result of [the defendant]'s disruption of the contract expectancy.

*Id.* at 414. That description also parallels the elements of the tort as set forth in the Restatement (Third) of Torts: Liability for Economic Harm § 18 (A.L.I. 2020).[2]

With that background in mind, we evaluate the four grounds on which the trial court sustained Ryan's demurrer to the tortious-interference claim.

---

[2] Section 18, "Interference with Economic Expectation," provides:

A defendant is subject to liability for interference with economic expectation if:

(a) the plaintiff had a reasonable expectation of economic benefit from a relationship with a third party;

(b) the defendant committed an independent and intentional legal wrong;

(c) the defendant intended to interfere with the plaintiff's expectation;

(d) the defendant's wrongful conduct caused the expectation to fail; and

(e) the plaintiff suffered economic loss as a result.

Restatement (Third) of Torts, *supra*, § 18, at 160.

*1. Hopkins adequately pleaded a probability of future commissions.*

To start, the trial court misapplied the legal standard for identifying a valid contractual or business expectancy. The trial court said that commissions were not payable until "earned" and that Hopkins had failed to plead that he "earned commissions that were not paid . . . or that [Ryan] kept him from receiving commissions that were earned." But that conflates a tortious-interference-with-contract claim with a tortious-interference-with-business-expectancy claim. For the latter, the plaintiff need allege only "a reasonable certainty that absent defendant's intentional misconduct, plaintiff would have continued in the relationship or realized the expectancy." *Com. Bus. Sys., Inc. v. Halifax Corp.*, 253 Va. 292, 300 (1997) (quoting *Glass v. Glass*, 228 Va. 39, 51-52 (1984)). Or as the latest Restatement puts it, the plaintiff must have "a reasonable expectation of economic benefit from a relationship with a third party." Restatement (Third) of Torts, *supra*, § 18(a).

The Court in *Commercial Business Systems* unpacked two principles implicit in this element. "First, proof . . . must meet an objective test; proof of subjective expectations will not suffice. In other words, mere proof of a plaintiff's belief and hope that a business relationship will continue is inadequate to sustain the cause of action." 253 Va. at 301. "Second, the proof must establish a 'probability' of future economic benefit to a plaintiff. Proof of a 'possibility' that such benefit will accrue is insufficient." *Id.*

Hopkins satisfied this pleading requirement. His amended complaint alleged that he had worked on a commission-only basis for CED since 2015. Company C had become one of his best clients, earning him more than $100,000 in commissions. Hopkins had "developed deep relationships and mutual trust" with its management. His expectation of future commissions was not speculative. To the contrary, Hopkins pleaded that he had "sealed" Company C's commitment to a $1.8 million deal to buy products from CED for the apartment-development

project, a deal from which he would earn substantial commissions. Those facts suffice at the pleading stage to satisfy the probable-expectancy element.

*2. Hopkins adequately pleaded that Ryan used improper methods.*

The trial court also erred in concluding that Hopkins failed to allege that Ryan used improper methods to interfere with his business expectancies.[3] To the trial court, Hopkins "simply alleged that his direct supervisor, [Ryan], reassigned some of CED's customer accounts." But that overlooked the deceptive scheme allegedly used by Ryan to destroy Hopkins's professional reputation, sabotage his relationship with Company C, and appropriate Hopkins's future commissions for himself.

In describing that scheme, Hopkins pleaded sufficient facts to show improper methods. As we find in part B, Hopkins alleged sufficient facts to show that the false-invoice scheme constituted actionable defamation, and defamation has long been recognized as an improper method. *E.g.*, *Duggin*, 234 Va. at 227. In addition, "an employee's breach of his . . . contractual duties may constitute the 'improper method' necessary to sustain a cause of action for intentional interference." *Hilb, Rogal & Hamilton Co. v. DePew*, 247 Va. 240, 246 (1994). Ryan allegedly used that kind of improper method by violating his own duties to his employer, causing CED to breach its contract with Company C by shipping used and defective equipment when Company C

---

[3] The trial court raised this argument sua sponte, contrary to Code § 8.01-273(A), which states that "[n]o grounds other than those stated specifically in the demurrer shall be considered by the court." Applying that rule, our appellate courts have refused to affirm a judgment sustaining a demurrer on grounds that were not raised in the appellee's demurrer in the trial court. *See, e.g.*, *TC MidAtlantic Dev., Inc. v. Commonwealth, Dep't of Gen. Servs.*, 280 Va. 204, 214 (2010); *Theologis*, 76 Va. App. at 604. As we said in *Theologis*, "Code § 8.01-273 prevents us from applying [the right-for-a-different-reason] doctrine to permit an appellee to benefit from an argument that he did not include in his own demurrer." 76 Va. App. at 604. But the posture of this appeal differs from those cases because Hopkins is seeking to invalidate the judgment, not to affirm it on other grounds. In any case, as Hopkins failed to raise this procedural objection either in the trial court or in his appellate brief, we assume without deciding that he waived it under Rules 5A:18 and 5A:20(c).

had ordered new equipment, all in a personal scheme to enrich himself and discredit Hopkins. Those allegations suffice at the demurrer stage to show improper methods. We thus do not address whether the false-invoice scheme could qualify as an improper method on the additional theory that it "violate[d] an established standard of a trade or profession, . . . involve[d] unethical conduct," or constituted "[s]harp dealing, overreaching, or unfair competition." *Duggin*, 234 Va. at 228 (citation omitted).[4]

*3. Hopkins adequately pleaded that Ryan acted outside the scope of his employment.*

The trial court also erred in finding that Ryan, as an agent of CED, could not be liable for tortiously interfering with Hopkins's commissions expectancy. The court reasoned that Ryan, "as manager of the sales accounts, is not a separate person from CED in his role and cannot interfere with these relationships, such as the relationship with Company C." To be sure, "[a] person cannot intentionally interfere with his own contract." *Fox v. Deese*, 234 Va. 412, 427 (1987). And a principal's agent acting within the scope of his employment likewise cannot intentionally interfere with the principal's contract. When an agent has acted "within the scope of his employment," the principal's contract is "also his contract, and he could not interfere with it." *Id.* But the reverse is also true: an agent can be liable for tortiously interfering with his principal's contract if he was acting "outside the scope of his employment." *Id.*

---

[4] Virginia's version of the cause of action for tortious interference with business expectancy largely aligns with the standards in the Restatement (Third) of Torts, *supra*. *See Allegheny Constr. Co. v. Town of Christiansburg*, 86 Va. App. 321, 362, 364-65 (2025) (Raphael, J., concurring). But the Restatement (Third) would *not* impose liability "if the defendant's act amounted only to 'sharp practice' or unethical behavior." Restatement (Third) of Torts, *supra*, § 18 cmt. b, at 161. The drafters reasoned that "[t]he law does not condone such conduct but does not treat it as a basis for liability in tort." *Id.*

We recently applied that distinction in *Allegheny Construction Co. v. Town of Christiansburg*, 86 Va. App. 321 (2025).[5] The general contractor there sued a town for breaching the construction contract. It also sued the town's architectural and engineering firms (and their respective employees) for tortiously interfering with that contract on the ground they had advised the town to deny the breach-of-contract claims. We held that the trial court erred in failing to dismiss the tortious-interference claims because the general contractor failed to allege facts to show that the architect or engineer (or their employees) had acted outside the scope of their agency. *Id.* at 343-44. Apropos of this case, we said that "*Fox* does not shield agents who act entirely outside of their agency—for example, by defrauding unrelated parties." *Id.* at 340. Because no such facts were alleged in *Allegheny Construction*, however, we held that the trial court should have sustained the defendants' demurrers. *Id.* at 343-44.

Virginia's rules about when a principal's agent can be liable for tortiously interfering with the principal's contract align with the Restatement (Third) of Torts:

> This distinction [between an agent and his principal] most often becomes important when the plaintiff had a contract with a corporation and sues one of the corporation's employees for interfering with it. In a case of that kind, the plaintiff can make out a claim of interference only by pointing to acts taken outside the defendant's scope of employment. The plaintiff bears the burden of proof, and it generally must be discharged by proving that the defendant was motivated entirely by personal gain at the corporation's expense. Mixed motives will not suffice. The bar is kept high because corporations can act only through their agents. It should not be easy for a party to turn a contract claim against a corporation into a tort claim by attacking those through whom the corporation carries out its business.
>
> . . . .

---

[5] As *Allegheny Construction* was decided after the parties completed their briefing here, we asked counsel to be prepared at oral argument to discuss its significance.

> The principles governing the liability of corporate agents also apply to other agents who are sued for interfering with the relationship between the plaintiff and the agent's principal.

Restatement (Third) of Torts, *supra*, § 17 cmt. a.[6]

Applying those principles, we hold that the trial court erred in sustaining Ryan's demurrer. When considering whether Ryan acted outside the scope of his agency, the trial court failed to take the alleged facts in the light most favorable to Hopkins. Hopkins alleged that Ryan acted entirely outside his agency role when he published the false invoice to ruin Hopkins's reputation with Company C and appropriate Hopkins's commissions for himself. He alleged that Ryan acted against CED's interests when Ryan caused CED to ship defective parts in place of the new equipment that Company C had ordered. Doing so breached CED's contractual obligations and risked losing Company C as a client. That factual predicate supported Hopkins's claims that: Ryan acted "outside the scope of [his] employment with CED"; there was "no legitimate business reason for . . . Ryan's actions other than to wrongfully interfere with . . . Hopkins'[s] economic and business interests"; Ryan "had no legitimate duty from CED to execute any part of his plan"; and "Ryan acted independently and certainly outside the scope of his agency/principal relationship with CED." As in *Fox*—and unlike in *Allegheny Construction*—resolving whether the defendant here acted outside the scope of his agency may well "require[] an evidentiary hearing." *Fox*, 234 Va. at 423.

---

[6] "Notably, the Restatement (Second) does not discuss whether an agent of a contracting-party promisor may be liable for interfering with the principal's contract with the promisee." *Allegheny Constr.*, 86 Va. App. at 359 (Raphael, J., concurring).

*4. Hopkins adequately pleaded Ryan's knowledge of Hopkins's commissions expectancy.*

The trial court also erred in finding that Hopkins failed to allege that Ryan "knew of [the] contract expectancy between Company C and [Hopkins]."[7] It is true that a prima facie case requires not only "the existence of a valid contractual relationship or business expectancy," but "knowledge of the relationship or expectancy on the part of the interferor." *Dunlap v. Cottman Transmission Sys., LLC*, 287 Va. 207, 216 (2014) (quoting *Chaves*, 230 Va. at 120). The trial court interpreted paragraph 22 of the amended complaint to imply that Ryan did not know that Hopkins expected commissions from the apartment-development project. Paragraph 22 stated: "Company C, Mr. Hopkins, and CED understood that due to the commitment of Company C, Mr. Hopkins would receive significant revenue from the agreement." The court reasoned that this sentence failed to state whether *Ryan* also knew about the project.

The trial court's narrow focus on that one sentence overlooked other allegations from which the reader would reasonably infer that Ryan knew that Hopkins expected commissions from Company C, including for the apartment-development project. A reasonable reader would not imagine that Hopkins's "manager" and "direct supervisor" was unaware that Hopkins was the sales representative for Company C and that his compensation depended on commissions. Indeed, Hopkins alleged that Ryan executed the false-invoice scheme specifically to discredit Hopkins in Company C's eyes to appropriate Hopkins's commissions for himself. The facts alleged in the amended complaint and the reasonable inferences to be drawn from them support Hopkins's allegation that "Ryan was aware of . . . Hopkins'[s] economic interests/expectancies and business interests/expectancies related to sales." Am. Compl. ¶ 51.

---

[7] The trial court also raised this ground sua sponte, contrary to Code § 8.01-273(A). But as Hopkins does not assign error to that aspect of the decision, we assume without deciding that he waived the procedural objection. *See supra* note 3.

*B. The trial court erred in dismissing the defamation claim.*

"In Virginia, when a plaintiff alleges defamation by publication, the elements are '(1) publication of (2) an actionable statement with (3) the requisite intent.'" *Schaecher v. Bouffault*, 290 Va. 83, 91 (2015) (quoting *Tharpe v. Saunders*, 285 Va. 476, 480 (2013)); *see also Patel v. CNN*, 83 Va. App. 387, 422 (2025) (same). In addition, Virginia "has long required that a defamation plaintiff plead the exact words alleged to be defamatory." *Bennett v. Lundh*, 85 Va. App. 136, 140 (2025).

The trial court ruled that Hopkins failed to plead a viable defamation claim because the false invoice was not a defamatory statement, the invoice failed to satisfy the exact-words requirement, the invoice did not implicate Hopkins, and the invoice carried no defamatory "sting." We disagree.

*1. The false invoice qualified as a defamatory statement.*

Hopkins's allegation that the false-invoice scheme defamed him fits within our historic understanding of what constitutes common-law defamation. William Blackstone explained in 1768 that libel was not limited to "printed or written" words but also consists of "pictures, signs, and the like; which set [a man] in an odious or ridiculous light, and thereby diminish his reputation." 3 William Blackstone, *Commentaries* \*125 (footnote omitted). Blackstone cited for that proposition *Austin v. Culpeper*, 2 Shower 313, 89 Eng. Rep. 960 (K.B. 1683). *See* Blackstone, *supra*, at 125 n."u."[8]

The plaintiff in *Austin* won a defamation judgment against the defendant for publishing a drawing of "a pillory" with the notation, "For Sir John Austin and his suborned, forsworn witness." 2 Shower at 313, 89 Eng. Rep. at 960. The appellate court upheld the judgment, describing the drawing and the accompanying text as "but one complicated act." *Id.* The court

---

[8] *Austin* is also reported at *Austin v. Culpeper*, Skin. 123, 90 Eng. Rep. 57 (K.B. 1683).

likened the libel there to that in an unreported case, *Bolton v. Deane*, where the defamation judgment was based on the defendant's "carrying a fellow about with horns, and bowing at [the plaintiff's] door," *id.*, thereby implying that the plaintiff was a cuckold. As another 18th century English law treatise explained, "the notion of a libel may be applied to any defamation whatsoever, expressed either by signs or pictures, as by fixing up a gallows against a man's door, or by painting him in a shameful and ignominious manner." William Hawkins, *Treatise of the Pleas of the Crown: Or a System of the Principal Matters Relating to That Subject, Digested under Their Proper Heads* 193 (1716) (capitalization altered).

At independence, Virginia adopted the common law of England as her own unless modified by the General Assembly, a directive that remains codified today in Code § 1-200. *See White v. United States*, 300 Va. 269, 277 & n.5 (2021). "Virginia courts are not at 'liberty to simply disagree with English common law.' If the common law is to be changed, the task belongs to the legislature." *Appian Corp. v. Pegasystems, Inc.*, ___ Va. ___, ___ (Jan. 8, 2026) (quoting *White*, 300 Va. at 278).

So the English concept that libel could include drawings and other expressive content became part of our defamation law as well.[9] Judge Roane alluded to that understanding in *Faulkner v. Alderson*, 21 Va. (1 Gilmer) 221 (1821), observing that a defamation action may be based on "speaking, writing, signs, or pictures." *Id.* at 227. The Court expanded on that idea in *Moss v. Harwood*, 102 Va. 386 (1904), explaining that defamation may be shown either by a "printing or writing, or by signs, pictures, or effigies, or the like" if it "tends to injure one's reputation in the common estimation of mankind, to throw contumely, shame, or disgrace upon him, or which tends to hold him up to scorn, ridicule, or contempt, or which is calculated to

---

[9] But "[u]nlike most states, Virginia makes no distinction between actions for libel and those for slander." *Fleming v. Moore*, 221 Va. 884, 889 (1981).

render him infamous, odious, or ridiculous." *Id.* at 392 (quoting Martin L. Newell, *Law of Libel and Slander in Civil and Criminal Cases as Administered in the Courts of the United States of America* 37 (2d ed. 1898)).

The Restatement (Second) of Torts embraced the same tradition. It clarified that a defamatory communication is not limited to "written or printed words" but includes "its embodiment *in physical form or by any other form of communication* that has the potentially harmful qualities characteristic of written or printed words." Restatement (Second) of Torts § 568(1) (emphasis added). "The word 'communication' is used to denote the fact that one person has *brought an idea* to the perception of another." *Id.*, § 559 cmt. a (emphasis added). That idea need not be communicated "by words. It is enough that the communication is reasonably capable of being understood as charging something defamatory." *Id.*, § 565 cmt. b. Thus, "[d]efamatory pictures, caricatures, statues and effigies" may qualify as "defamatory publication[s] . . . embodied in physical form." *Id.*, § 568 cmt. d.[10]

The Restatement offers some helpful illustrations. A photograph in a print advertisement is defamatory if it signals the plaintiff's misconduct:

> A without the consent of B, an amateur golfer, publishes B's
> picture in an advertisement that represents B in the act of eating a
> chocolate bar manufactured by A's company. A number of
> persons understand from this advertisement that B has forfeited his
> amateur standing as a golfer by receiving compensation for the
> publication of his photograph. The communication is defamatory.

*Id.*, § 565 cmt. b, illus. 1. A plaintiff can also be defamed if the defendant "prepares a wax figure recognizable as a representation of [the plaintiff] and places it among a number of effigies of

---

[10] Modern tort treatises reach similar conclusions. *See, e.g.*, Dan B. Dobbs, *The Law of Torts* 1122 (2000) ("Pictures, songs, movies, and computer communications can all count as publications. Even some signs or actions without words can communicate a defamatory falsehood.").

famous murderers in 'The Chamber of Horrors,' where it is seen by a number of persons." *Id.*, § 568 cmt. d, illus. 3.

Another good example comes from an early English case, *Jefferies v. Duncombe*, 11 East. 226, 103 Eng. Rep. 991 (K.B. 1809). The court there upheld a defamation judgment premised on the defendant's placing a "certain lamp" outside the plaintiff's home "in the day-time" to falsely suggest that it was "bawdy-house." *Id.* at 227-29, 103 Eng. Rep. at 991-92.[11] Lord Chief Justice Ellenborough explained that the lamp had the same "purpose of defaming" the plaintiff as if the defendant had stood in front of the house and "declared" the same thing. *Id.* at 229, 103 Eng. Rep. at 992.

Falsely attributing a communication to the plaintiff may also be defamatory. A false attribution "may result in injury to reputation because the manner of expression or even the fact that the statement was made indicates a negative personal trait or an attitude the speaker does not hold." *Tharpe*, 285 Va. at 482. "The imputation may be carried quite indirectly, as where the plaintiff's name is signed as author to a false or very bad piece of writing . . . ." W. Page Keeton et al., *Prosser & Keeton on Torts* 780 (5th ed. 1984). In *Ben-Oliel v. Press Publishing Co*., 167 N.E. 432 (N.Y. 1929), for instance, a newspaper falsely attributed an article to the plaintiff, a prominent authority and lecturer on life in Palestine. The article contained various caricatures and untrue statements that made the author appear to be "ignorant as well as stupid"—"a fraud, a deceiver and a charlatan"—thereby damaging her professional reputation. *Id.* at 433. The court held that the complaint stated a valid defamation claim. *Id.* at 434.

---

[11] The opinion does not describe the lamp's appearance. Modern authorities tell us that at least by the 20th century, "[b]rothels were . . . typically identified by a red light displayed in a window or in the front yard." *Red-light abatement law*, *Black's Law Dictionary* (12th ed. 2024); *see also Bunkley v. Commonwealth*, 130 Va. 55, 64 (1921) (describing the local area known for "bawdy houses" as a "red light district").

The false-invoice scheme alleged here is similar in kind to those historical examples of defamatory communications. The amended complaint alleged that Ryan doctored the invoice to falsely attribute its authorship to Hopkins, thereby communicating the idea not only that Hopkins prepared it but that he was incompetent. The invoice used numerical codes and quantities identifying new materials to be shipped to Company C when, in fact, Ryan had caused CED to ship "old, used, and broken parts." Am. Compl. ¶¶ 26-32. Ryan allegedly "intended this forged instrument to be passed off as the work product of" Hopkins, thus harming his reputation. *Id.*, ¶ 35. Those allegations suffice at the pleading stage to allege a defamatory communication.

*2. The photograph of the false invoice satisfied the exact-words requirement.*

The requirement "that a defamation plaintiff plead the exact words alleged to be defamatory," *Bennett*, 85 Va. App. at 140, was satisfied by Hopkins's including a photograph of the false invoice itself in the complaint. *See* Am. Cmpl. ¶ 30. That was the defamatory communication at the core of Ryan's alleged scheme, a communication used to convey the idea that Hopkins could not be trusted to deliver the new equipment that Company C had ordered.

*3. The false invoice was "of and concerning" Hopkins.*

"A pleading for defamation must allege or otherwise make apparent on the face of the pleading that the alleged defamatory statements are 'of and concerning' the plaintiff." *Schaecher*, 290 Va. at 99 (quoting *Dean v. Dearing*, 263 Va. 485, 488 (2002)). In other words, the complaint must explain "how the allegedly defamatory statement refers to the plaintiff, if he is not explicitly named." *Id.* at 92 (quoting *Webb v. Virginian-Pilot Media Cos.*, 287 Va. 84, 88 (2014)). The connection between the defamatory statement and the plaintiff must be enough that "the recipient of the defamatory communication understand[s] it as intended to refer to the plaintiff." Restatement (Second) of Torts § 564 cmt. a. But when the defamatory communication "is in fact intended to refer to [the plaintiff], it is enough that it is so understood

- 18 -

even though he is so inaccurately described that it is extraordinary that the communication is correctly understood." *Id.*

The amended complaint here alleged sufficient facts to show that Company C understood that Hopkins had authored the invoice. "Ryan orchestrated the shipment of . . . defective product intentionally to harm . . . Hopkins," publishing the "false purchase document . . . intentionally" to disparage him. Am. Compl. ¶¶ 29-30. "Ryan intended this forged instrument to be passed off as the work product of . . . Hopkins." *Id.*, ¶ 35. Ryan succeeded in connecting the false invoice to Hopkins. Indeed, because of the false-invoice scheme, Company C ordered its employees to stop working with Hopkins and threatened to fire anyone who did. *Id.*, ¶¶ 38-39. "Assuming, as we must, the truth of all the facts properly pleaded by the plaintiff, and giving [him] the benefit of all facts implied and fairly and justly inferred from them," the false invoice was "reasonably capable of conveying the defamatory innuendo of which the plaintiff complains." *Pendleton v. Newsome*, 290 Va. 162, 174-75 (2015).

> 4. *The false invoice was defamatory because it impugned Hopkins's fitness as a sales representative.*

"Not all false and disparaging statements about a person are defamatory." *Theologis*, 76 Va. App. at 605. For a statement of fact to qualify as actionable defamation, the statement must be "both false and defamatory." *Schaecher*, 290 Va. at 91. "Defamatory words are those 'tend[ing] so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.'" *Id.* at 91-92 (quoting Restatement (Second) of Torts § 559). The "false statement must have the requisite defamatory 'sting' to one's reputation." *Id.* at 92. "In evaluating whether a statement carries enough sting, courts 'take all inferences in favor of the plaintiff, but such inferences cannot rise above the language of the documents or statements themselves.'" *Theologis*, 76 Va. App. at 605-06 (quoting *Schaecher*, 290 Va. at 93).

The trial court ruled that the false-invoice scheme did not harm Hopkins's reputation because "[t]here is no 'sting' to a sloppy purchase order." But that again misapplies the law and fails to take the facts in the light most favorable to Hopkins.

"At common law, defamatory words that 'prejudice [a] person in his or her profession or trade' are actionable as defamation *per se*." *Fuste v. Riverside Healthcare Ass'n*, 265 Va. 127, 132 (2003) (alteration in original) (quoting *Carwile v. Richmond Newspapers, Inc.*, 196 Va. 1, 7 (1954)). Damages are presumed for a claim of defamation per se, so the plaintiff does not need to allege that the defamation caused him to suffer special damages. "It is difficult, if not impossible, to prove with mathematical precision the quantum of damages for injury to reputation, humiliation, and embarrassment which may flow from a defamation." *Great Coastal Express, Inc. v. Ellington*, 230 Va. 142, 148 (1985). "For this reason, the common law, as early as 1670, modified the usual standard of proof of damages in those cases where the words uttered were actionable per se." *Id.*

For example, it is defamation per se to tell another person "that an attorney 'just takes people's money' and that an attorney's clients receive less for their claims because of the attorney's services." *Tronfeld v. Nationwide Mut. Ins. Co.*, 272 Va. 709, 714 (2006). "Such statements damage an attorney's standing to engage in his or her chosen profession and carry the connotation that he or she lacks the integrity and fitness to practice law." *Id.* Statements that doctors had "abandoned" their patients and that coworkers had "concerns" about the doctors' competence are likewise defamatory per se. *Fuste*, 265 Va. at 133. This principle does not protect only those engaged in "learned professions." Restatement (Second) of Torts § 573 cmt. b. "It is equally applicable to artisans, mechanics and workmen generally, whether skilled or unskilled." *Id.*

The amended complaint here alleged sufficient facts to show that the false-invoice scheme "prejudiced" Hopkins in his "profession or trade." *Carwile*, 196 Va. at 7. Hopkins alleged that Ryan intended his false-invoice scheme to cause Company C to stop dealing with him and that the scheme worked. Believing that Hopkins was responsible for shipping used and defective parts when it had ordered new parts, Company C refused to do further business with him. *Id.*, ¶¶ 38-39. That allegation is not farfetched. A salesman's reputation is plausibly damaged by a public communication that he promised a customer new goods and instead delivered used and defective goods. The amended complaint thus adequately alleged that the false-invoice scheme damaged Hopkins's "reputation within his field of employment." Am. Compl. ¶ 67.[12]

CONCLUSION

It remains for Hopkins to prove his factual allegations in the trial court. But considering the facts of the amended complaint in the light most favorable to him, we find that Hopkins stated viable tortious-interference and defamation claims. The trial court thus erred in sustaining the demurrer and dismissing the case. We reverse the judgment and remand the case for further proceedings consistent with this opinion.

*Reversed and remanded.*

---

[12] We need not decide whether the false-invoice scheme qualifies as defamation per se, for which damages would be presumed. *See* Restatement (Second) of Torts § 573 cmt. d ("A statement imputing a single mistake or act of misconduct . . . in the conduct of a business or profession is actionable . . . [as defamation per se] only if the act fairly implies [a] habitual course of similar conduct, or the want of the qualities or skill that the public is reasonably entitled to expect of persons engaged in such a calling."). Because that question is better answered on a more fully developed record, we leave it to the parties and the trial court to address on remand. It suffices to resolve this appeal that Hopkins alleged sufficient facts at the pleading stage to show that Ryan's false-invoice scheme carried enough sting to damage Hopkins's professional reputation.